# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| _____ ) | |
| THE CITY OF PHILADELPHIA BOARD ) | |
| OF PENSIONS AND RETIREMENT, ) | |
| Derivatively, On Behalf of WELLCARE ) | |
| HEALTH PLANS, INC., ) | |
| ) | **Case No.** _____ |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| TODD S. FARHA, PAUL L. BEHRENS, ) | |
| REGINA E. HERZLINGER, KEVIN F. ) | |
| HICKEY, ALIF A. HOURANI, RUBEN ) | |
| JOSE KING-SHAW, JR., CHRISTIAN P. ) | |
| MICHALIK, NEAL MOSZKOWSKI, ) | |
| and THADDEUS BEREDAY, ) | |
| ) | |
| ) | |
| Defendants, ) | **JURY TRIAL DEMANDED** |
| ) | |
| -and- ) | |
| ) | |
| WELLCARE HEALTH PLANS, INC., ) | |
| ) | |
| Nominal Defendant. ) | |
| _____) | |

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff City of Philadelphia Board of Pensions and Retirement ("Plaintiff" or

"Philadelphia Board of Pensions"), by its attorneys, submits this Verified Derivative Complaint

(the "Complaint") against the defendants named herein.  The allegations of the Complaint are

based on the personal knowledge of Plaintiff as to itself and on information and belief including

the investigation of Plaintiff's counsel, which included a review of filings with the United States

Securities and Exchange Commission ("SEC"), as well as press releases and other public

statements issued by WellCare Health Plans, Inc. ("WellCare" or the "Company"), and securities analysts' reports, and other media reports about the Company.

## NATURE OF THE ACTION

1.      This is a shareholders' derivative action brought for the benefit of nominal defendant WellCare against certain members of its Board of Directors (the "Board") and certain of its current and former executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and other violations of law, including violations of the Securities Exchange Act of 1934 ("Exchange Act").  On behalf of WellCare, this action seeks, among other things, damages, corporate governance reforms, and restitution.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331 in that Plaintiff's claims arise in part under the Constitution and laws of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3.      Venue in proper in the Court pursuant to 28 U.S.C. § 1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to WellCare occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

2

## PARTIES

4.     Plaintiff, Philadelphia Board of Pensions, is a large institutional pension fund with over $5 billion in assets.  At all times relevant to this action, Plaintiff is a long-term shareholder of nominal defendant WellCare.  Plaintiff has continuously held shares of WellCare common stock since July 11, 2005.  Between July 11, 2005, and December 28, 2007, Plaintiff purchased 48,106 shares of WellCare stock at a cost of $3,383,341.  As a result of the misconduct alleged herein, Plaintiff has suffered investment losses of $595,238.  Currently Plaintiff holds 1,740 shares of WellCare common stock.

5.     Nominal defendant WellCare is a Delaware corporation with its principal executive offices located at 8725 Henderson Road, Renaissance One, Tampa, Florida.  WellCare provides managed care services exclusively to government-sponsored healthcare programs, focusing on Medicaid and Medicare, including health plans for families, children, the aged, blind, and disabled and prescription drug plans, serving approximately 2.3 million members nationwide as of June 30, 2007.

## DEFENDANTS

6.     Defendant Paul Behrens ("Behrens") has served as Senior Vice President ("SVP") and Chief Financial Officer ("CFO") of the Company since September 2003.  According to the Company's Proxy Statement filed on April 27, 2007, ("2007 Proxy") Defendant Behrens received at least $984,177 in compensation for 2006, including a base salary of $282,269; a bonus of $200,000; and stock and option awards of $497,829.  During the relevant period, Behrens sold his personally held shares of WellCare stock for gross proceeds of $10,529,113 at artificially inflated prices.

3

7.    Defendant Thaddeus Bereday ("Bereday) has served as the Company's SVP, General Counsel ("GC"), and Secretary since November 2002.  Prior to joining the Company, Bereday was a partner at the law firm of Brobeck, Phleger & Harrison, LLP, where he served as outside counsel during the buy-out of the Company led by Farha and the current management team.   Additionally, he serves as the Company's chief compliance officer and has led the implementation of the Trust Program; WellCare's purported corporate ethics and compliance program.   According to the Company's 2007 Proxy, Defendant Bereday received at least $596,500 in compensation for 2006, including a base salary of $256,462; a bonus of $150,000; and stock and option awards of $180,293. During the relevant period, Bereday sold his personally held shares of WellCare stock for gross proceeds of $13,859,690 at artificially inflated prices.

8.    Defendant Todd S. Farha ("Farha") has served as the Company's President and Chief Executive Officer ("CEO") and as a member of the Board since May 2002.  He has served as the Chairman of the Board ("Chairman") since October 2006.  Farha is a cousin of Defendant Hourani.  Before joining WellCare, Farha served as an executive of Oxford Health Plans, Inc. ("Oxford") or its affiliates where he worked alongside Defendant Hickey.  According to the Company's 2007 Proxy, Defendant Farha received at least $5,270,825 in compensation for 2006, including a base salary of $400,000; a bonus of $400,000; and stock and option awards of $4,393,764.  During the relevant period, Farha sold his personally held shares of WellCare stock for gross proceeds of $46,505,115 at artificially inflated prices.

9.    Defendant Regina E. Herzlinger ("Herzlinger") has served a director of the Company since August 2003.  She is currently the chairwoman of the Board's Audit Committee

4

("Audit Committee").  According to the 2007 Proxy, through June 2006, Herzlinger was paid an annual director's fee of $25,000. Commencing July 2006, Herzlinger received an annual director's fee of $27,500, as well as an award of 6,500 stock options, which vested immediately. During the relevant period, Herzlinger sold her personally held shares of WellCare stock for gross proceeds of $2,323,230 at artificially inflated prices.  Additionally, according to the Proxy, Herzlinger is an "audit committee financial expert" as defined in the Exchange Act.

10.     Defendant Kevin F. Hickey ("Hickey) has served as a director of the Company since November 2002.  He is currently a member of the Board's Compensation Committee ("Compensation Committee").  Hickey formerly served as an executive of Oxford or its affiliates alongside Defendant Farha. Hickey was paid an annual fee of $25,000 through July 2006. Commencing July 2006, Hickey received an annual fee of $27,500 as well as 5,000 stock options.  During the relevant time period Hickey sold his personally held shares of WellCare stock for gross proceeds of 1,177,936 at artificially inflated prices.

11.     Defendant Alif A. Hourani ("Hourani") has served as a director of the Company since August 2003.  He currently serves as a member of the Audit Committee, Compensation Committee and the Board's Nominating & Corporate Governance Committee ("Corporate Governance Committee").  Hourani is a cousin of Defendant Farha.  Commencing July 2006, Hourani received an annual fee of $27,500 as well as 5,000 stock options.  During the relevant time period Hourani sold his personally held shares of WellCare stock for gross proceeds of $2,952,965 at artificially inflated prices.

12.     Defendant Ruben Jose King-Shaw, Jr. ("King-Shaw") has served as a director of the Company since August 2003.  From July 2001 through April 2003, King-Shaw served as

Chief Operating Officer and Deputy Administrator of the federal government's Centers for Medicare & Medicaid Services. Prior to that he was secretary of the Florida Agency for Health Care Administration. Commencing July 2006, King-Shaw received an annual fee of $27,500 as well as 5,000 stock options. During the relevant time period King-Shaw sold his personally held shares of WellCare stock for gross proceeds of $2,501,038 at artificially inflated prices.

13.     Defendant Christian P. Michalik ("Michalik") has served as a director of the Company since May 2002. He currently serves as a member of the Audit Committee, as well as the Corporate Governance Committee. Additionally, according to the 2007 Proxy, Michalik is an "audit committee financial expert," as defined in the Exchange Act. From January 1999 through December 2003, he was a partner in Soros Private Equity Partners LLC, ("Soros") the private equity investment business of Soros Fund Management LLC, where he worked alongside Defendant Moszkowski, who served as Managing Director and Co-head of Soros. Commencing July 2006, Michalik received an annual fee of $27,500 as well as 5,000 stock options. During the relevant time period Michalik sold his personally held shares of WellCare stock for gross proceeds of $2,252,369 at artificially inflated prices.

14.     Defendant Neal Moszkowski ("Moszkowski") has served as a director of the Company since May 2002, and he was Chairman from May 2002 through October 2006. He currently serves as Chairman of both the Compensation Committee and the Corporate Governance Committee. He has been designated by the Board as the "Presiding Director," and presides over executive sessions of the non-management and independent directors, and receives communications from interested parties pursuant to the NYSE and SEC rules. Additionally, he currently serves as the co-CEO of TowerBrook Capital Partners, a private equity investment

company.  More specifically Towerbrook Capital Partners, which is the general partner of TCP LP., which is the general partner of Towerbrook Investors L.P., which was formerly known as Soros Private Equity Investors L.P.  While Moszkowski served as Chairman of WellCare, Moszkowski was the managing Director and Co-head of Soros, alongside Defendant Michalik, who served as a partner in Soros.  In 2006, TowerBrook Investors, L.P., and other entities affiliated with Soros, liquidated its approximate 12.8% interest in WellCare for proceeds of approximately $870 million.  Moszkowski began receiving an annual retainer commencing April 2007.  In April 2007 Moszkowski was awarded 2,728 shares of restricted stock which vested over a 2 year period and 10,495 stock options which were immediately vested.  During the relevant time period Moszkowski sold his personally held shares of WellCare stock for gross proceeds of $8,342,508 at artificially inflated prices.

15.     Defendants Herzlinger, Hourani, and Michalik are referred to herein as the "Audit Committee Defendants."  Defendants Hickey, Hourani, and Moszkowski are referred to herein as the "Compensation Committee Defendants."

16.     Behrens, Bereday, Farha, Herzlinger, Hickey, Hourani, Michalik and Moszkowski Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

17.      By reason of their positions as officers and/or directors of the Company and because of their ability to control the business operations and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual

7

Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

18.     As officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financials including, among other things, the revenue, earnings and net income and compliance with applicable state and federal laws, including Medicaid and Medicare laws, so that the market price of the Company's stock would be based on truthful and accurate information.

19.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of WellCare, and was at all times acting within the course and scope of such agency.

20.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of WellCare, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with WellCare, each of the Individual Defendants had access to material adverse, non-public information about the financial condition, operations, and improper representations of WellCare.

8

21.     By virtue of such duties, the officers and directors of Wellcare were required to, among other things:

a.      manage, conduct, supervise and direct the business affairs of WellCare in accordance with all applicable laws (including federal and state laws, government rules and regulations and the corporate charter and bylaws of WellCare);

b.      neither violate nor knowingly or recklessly permit any officer, director or employee of WellCare to violate applicable laws, rules and regulations;

c.      establish and maintain systematic and accurate records and reports of the business and affairs of WellCare and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing nor knowingly permit any officer, director or employee of WellCare to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the ("SEC") and the investing public; and

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

22.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

      b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

      c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

      d.     exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

      e.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

23.     The Individual Defendants, particularly the executive officers and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

a.      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b.      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

(1)    transactions are executed in accordance with management's general or specific authorization; and

(2)    transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

24.      Additionally WellCare has an Audit Committee charter, which includes certain responsibilities of the Audit Defendants.  These responsibilities included:

a.  Review significant accounting and reporting issues and regular reports from the independent auditor on the critical policies and practices of the Company, and all alternative treatments of financial information within GAAP that have been discussed with management;

b.  Review with the independent auditors the results of the audit, any audit problems or difficulties encountered and management's response to such problems or difficulties;

c.  Review with management and the independent auditors the annual audited financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations prior to the filing of the Company's Annual Report on Form 10-K, including their judgment about the quality, not just the acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity of the disclosures in the financial statements;

11

d.  Including complex or unusual transactions and highly judgmental areas, and recent professional and regulatory pronouncements, and understand their impact on the financial statements;

e.  Review the interim financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations with management and the independent auditors prior to the filing of the Company's Quarterly Report on Form 10-Q;

f.  In connection with the Audit Committee's review of the Company's annual audited and/or quarterly unaudited financial statements, the Audit Committee shall review and discuss the following:

- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and any major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies;
- Analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and
- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements;

g.  Review the following matters with the independent auditor:

- All critical accounting policies and practices to be used;
- All alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the preferred treatment of the auditor; and
- Other material written communications between the auditor and management including any management letter or schedule of unadjusted differences;

12

h.  Consider the effectiveness of the Company's internal control system;

i.  Understand the scope of internal and independent auditors' review of internal control over financial reporting, and obtain reports on significant findings and recommendations, together with management's responses;

j.  Review management's annual report on internal control over financial reporting prior to the Company's inclusion of such annual report in the Company's annual report on Form 10-K; and

k.  Review any significant deficiencies or material weaknesses identified in the Company's internal control over financial reporting, and any special steps taken as a result thereof.

25.     The Audit Committee Charter also includes the Committees' responsibilities regarding the internal audit, independent auditors' compliance and reporting responsibilities.

26.     WellCare also established a Trust Program.  The Trust Program is the Company's Corporate Ethics and Compliance Program, which is "designed to assist WellCare to conduct its business in accordance with applicable federal and state laws and WellCare's high standards of business ethics.  Additionally, the Trust Program is intended to satisfy the requirements of the Federal Sentencing Guidelines, the Department of Health and Human Services, the regulations of the various regulatory agencies in each of the states we serve, the Securities and Exchange Commission and the New York Stock Exchange."  The Trust Program's charter states among other things:

1.  WellCare, its directors and associates are responsible for complying with the Trust Program, applicable federal and state laws, rules and regulations and WellCare's high standards of business ethics.

13

2. Directors and associates must avoid situations where their personal interests could conflict or appear to conflict with the best interests of WellCare. Wellcare expects all Directors and associates to maintain loyalty to Wellcare. Conflicts of interst may arise when a Director's or associate's position or responsibility presents an opportunity for personal gain apart from the normal compensation provided through employment or service with Wellcare. A conflict situation can also arise when a Director or associate takes actions or has interests that may make it difficult to perform his or her work on behalf of WellCare in an objective and effective manner.

3. Directors and associates must not take for themselves personally any opportunity that is discovered through the use of corporate property, information or position.

4. All of WellCare's assets, profits, losses and transactions must be properly documented, fully accounted for, promptly recorded in the appropriate books and records and properly reported in conformity with applicable accounting and related principles.

5. All Directors and associates must refrain from trading in securities of WellCare or any other company while in possession of material, nonpublic information about WellCare or the other company, and may not convey inside information regarding WellCare or any other company to any other person.

6. WellCare, its Directors, associates and business partners are prohibited from participating in any scheme or plan that would constitute fraud or abuse within the organization or with its business partners and, to the best of their abilities, are obligated to detect and report any suspected incidents of fraud or abuse in accordance with the procedures set forth in the Trust Program.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

27.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

28.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

a.  conceal the fact that the Company was improperly misrepresenting its financial results in order to allow defendants to artificially inflate the price of the Company's shares;

b.  conceal the fact that the Company was misreporting revenues earned through government-sponsored health care programs;

c.  maintain the individual Defendants' executive and directorial positions at WellCare and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and

d.  deceive the investing public, including shareholders of WellCare, regarding the Individual Defendants' management of WellCare's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.

29.   In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

30.   The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least May 8, 2006 and continuing thereafter. During this time, the Individual Defendants caused the Company to conceal the true fact that WellCare was misrepresenting its financial results and violating federal and state laws. In addition, defendants also made other specific, false statements about WellCare's financial performance and future business prospects, as alleged herein.

31.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste  of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of WellCare common stock so they could: (i)

dispose of over $75 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

32.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

33.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

### The Unprecedented Government Raid on WellCare

34.     On October 24, 2007, about 200 agents of the Federal Bureau Investigation ("FBI"), the Department of Health and Human Services ("DHS"), and the Florida Attorney General's Medicaid Fraud Unit raided WellCare's Tampa, Florida headquarters pursuant to a search warrant.

16

35.     None of the government agencies involved in the investigation have discussed the purpose or scope of the search warrant. On the contrary, the government's probable cause affidavit was filed under seal.  Despite efforts by journalists to unseal the probable cause affidavit, this key piece of information explaining the government' case against WellCare officers and directors remains hidden from public view.  In a November 17, 2007 article the Tampa Tribune commented that the warrant demonstrated that "[f]ederal and state agents had a wide focus in their raid of WellCare Health Plans, seeking evidence of 'monetary overpayments' received by the Tampa company from government-sponsored health programs." Indeed, government agents "searched for information ranging from WellCare's internal audit committee to items related to the Louis de la Parte Florida Mental Health Institute at the University of South Florida."   Additionally, "agents retrieved documents referencing activities in at least nine states, including Florida, New York, Illinois, Georgia and Ohio."

36.     As noted in a November 20, 2007 article by the St. Petersburg Times among the documents seized from executives' desks, were several with suggestive names, such as: (1) the CFO's "2007 Stairway to Heaven" plan as well as a document entitled "Analysis of shorting stock;" (2) a copy of a check for a Puerto Rico Saint Festival; (3) handwritten notes about "shell companies;" (4) a memo called "cracking the WellCare DaVinci Code with Payment schedule;" (5) a document called "Jo-Jo phantom accounts analysis – Florida miscoding;" (6)  a letter to "get around Medicaid requirements;" and (7) a letter called "docs re: possible kickback."

37.     A December 8, 2007 St. Petersburg Times article stated that at least one aspect of the investigation appears to be focused on WellCare's mental health services for Florida

Medicaid members.  Additionally, a November 2, 2007 article in *The Wall Street Journal*

detailed at least one reason for the raid, stating:

> The recent raid . . . was spurred at least in part by allegations that the company
> inflated the amount it spent on mental health care in order to keep money it
> should have refunded to Florida's Medicaid program, according to a person
> familiar with details of the investigation.

> The raid followed the filing of a so-called whistleblower lawsuit by a former
> financial-department employee of Harmony Behavioral Health, a WellCare
> subsidiary, this person said.  The company's practices allegedly defrauded the
> state-federal health-care program of more than $35 million over five years,
> according to the person familiar with the probe.

38.     *The Wall Street Journal* article also details the ways in which the Company might

have improperly collected more money than it deserved, including:

> List[ing] its patients as younger than they were, which might have brought
> WellCare higher payments from Medicaid.

> In addition, investigators are examining an arrangement with a Cayman Islands
> subsidiary that could have helped the company misrepresent its outlays for care in
> a way that allowed WellCare to keep more of the mental-health payments it
> received, this person said.

> Under Florida's Medicaid program, the state pays HMOs a fixed monthly amount
> for each patient enrolled, without regard to the amount of medical services the
> person actually receives.  Generally, companies can keep the difference if a
> patient's claims don't eat up the monthly allowance.  However, when it comes to
> mental-health care, WellCare and other managed-care contractors are penalized if
> they don't spend at least 80% on mental-health services; if they spend less, the
> companies must return money to the states.

> Investigators are examining whether the company paid its Cayman Island unit
> premiums as much as five times market prices for reinsurance, thereby inflating
> expenses for care that it reported to the state and allowing it to refund less money,
> according to the person with knowledge of the inquiry.

39.     On November 5, 2007, the Company responded to the November 2, 2007 article

in *The Wall Street Journal*, stating that it had learned from a docket search that a former

18

employee of the Company's special investigations unit had filed a *qui tam* action on October 25, 2007, in state court in Leon County, Florida, against several defendants, including the Company. The Company stated that it did not know whether the action related to the investigations or to the allegations in *The Wall Street Journal* article, as the complaint was sealed.

**Other Government Investigations of WellCare**

40.     In the days immediately following the raid, a number of other government investigations of WellCare came to light.  On October 26, 2007, WellCare announced that it had received requests for information from the SEC the day before.  According to an October 25, 2007, *Kaiser Daily Health Policy Report*, Georgia's Department of Community Health has also been investigating WellCare and is auditing payments to medical providers for the insurer.

41.     Additionally, the Attorney General for the State of Connecticut confirmed in a press release on October 26, 2007, that his office had been conducting a months-long investigation into WellCare of Connecticut, Inc. – an affiliate of WellCare. More specifically, the Connecticut Attorney General stated:

> [M]y office is investigating transactions between WellCare and its affiliate companies – and their potential impact on the costs of our state's Medicaid program.  Out interest began after receiving a whistleblower complaint – as well as public reports by Wall Street analysts alleging that WellCare was hiding and misreporting profits earned through its Medicaid programs.
>
> Our state relies on factual reporting of company profits in order to properly and fairly set rates for our Medicaid program – and adequately ensure care for our state's most vulnerable citizens, particularly children.  Our investigation, separate and unrelated to the federal and Florida state investigation and raid announced earlier this week, is continuing vigorously and aggressively.

42.     According to an October 30, 2007 *Reuters* article, New York State regulators were also looking at WellCare's activities regarding New York's Medicaid program and "are reviewing contracts the insurer has with the New York state Medicaid program."

43.     Additionally, according to the *Kaiser Daily Health Policy Report*, over the last year the company has been required to suspend marketing of its private fee-for-service Medicare Advantage plans amid allegations of illegal and aggressive sales practices.  These sales practices included enrollment of dead or mentally incompetent Medicare beneficiaries, the impersonation of Medicare representatives, and the use of personal information stolen from federal records.

44.     Moreover, Defendants Farha, Hourani, and Hickey have previously been associated with distressed companies. On November 9, 2007, *The Street.com* published an article entitled Wellcare CEO Has Seen This Movie Before, detailing these Defendants employments:

> WellCare investors, already nervous about tight-lipped company leaders, better hope that history doesn't repeat itself.
>
> Weeks after government officials swarmed its Florida headquarters, WellCare still has offered no clues about the focus or potential impact of a sweeping investigation of the company. Despite that uncertainty, investors have taken comfort in the fact that WellCare boasts a strong track record and seems to employ a topnotch management team. Up to now, in fact, WellCare has ranked as a perennial Wall Street favorite known for its ability to make a fortune providing government-subsidized health insurance for the elderly and the poor.
>
> **But past disasters at companies tied to WellCare leaders, including CEO Todd Farha, suggest that current investor confidence could prove misplaced. Notably, before taking over at WellCare -- and transforming the company into a Wall Street darling -- Farha worked for two booming health insurers that suffered spectacular collapses.**
>
> TheStreet.com sought input from WellCare for this story. But as a matter of policy, the company sticks with public disclosures about its executives' employment histories and declines to elaborate any further on personnel matters.
>
> Still, the public record says plenty.

20

First, back in the early 1990s, Farha worked alongside his cousin Alif Hourani (now deemed an "independent" member of WellCare's audit committee) at Physician Corporation of America. Although PCA seemed to be in good shape when Farha departed, the company was fighting for survival just a few years later By then, Farha had long since moved on to Oxford Health. There, Farha served as a key division leader during a stunning meltdown exactly one decade ago.

Credit Suisse analyst Gregory Nersessian expressed a sense of déjà vu when penning a particularly observant research note, entitled "Lightning Strikes Twice," following WellCare's own setbacks last month.

**"That day, Oxford announced a $50 million charge to earnings, lowered its enrollment and earnings outlook, acknowledged revenue and claims recognition improprieties and initiated a series of events that would lead to senior management changes, lawsuits, regulatory investigations -- and what would ultimately become, in the opinion of many observers, the most notorious blow-up in managed care history," Nersessian recalled in late October.**

"Fast forward 10 years to the date, and once again, Farha ... found himself in the midst of an unpleasant regulatory predicament and facing a precipitous decline in the stock price of his company," Nersessian added. "Eerily, Oxford and WCG shares both fell by the same percentage -- 63% -- on their first day of trading" following their respective bombshells.

To be sure, the coincidences could end there. But if they do not, research by TheStreet.com suggests, investors could face even more pain ahead.

**History Lesson**

A close look at the past could fuel investor concerns.

Start first with a review of PCA, a Medicaid HMO provider that once counted several WellCare leaders among its own. With cousin Hourani already in the executive suite, Farha started working at PCA -- alongside former WellCare director Glen Johnson -- back in 1990. Farha filled "various positions" at PCA, according to WellCare's original registration statement, before moving on in 1993.

That year, the Miami Daily Business Review reported, PCA went on a 14-city road show and -- with its business booming -- managed to tap the capital markets twice for millions of dollars in fresh funding.

21

"A lot of new investors heard our story for the first time," PCA CFO Clifford Donnelly told the newspaper back then. And "we thought it more prudent to get additional equity when the market was still there."

**Two years later, with PCA reporting high medical costs and meager profits, that investor enthusiasm had disappeared. From there, the situation only grew worse. In late 1996, PCA weathered massive charges that left the company bleeding badly and scrambling for a well-capitalized suitor.**

Sierra first came to the rescue -- sending its own shares plunging in the process -- but soon backed away from the deal. Afterwards, under pressure from lenders and regulators, PCA embraced a smaller offer from Humana

At first, Humana followers viewed the 1997 buyout as an attractive bargain. Less than a year later, in an article published by Modern Healthcare, Humana itself was still celebrating the deal -- and boasting that the company always "buys wisely" -- at the start of an apparent turnaround.

By early 2000, however, Humana was taking a huge charge to write down the value of that misguided acquisition. Humana would continue to pay for that buyout -- forking over settlements to regulators, hospitals and shareholders alike -- for years to come.

**Weak Pulse**

Meanwhile, several PCA executives with future ties to WellCare faced their own challenges.

By 1997, Farha's days at Oxford were already numbered. That same year, both Hourani and Johnson saw their PCA careers end with Humana's takeover of the company.

But Hourani, at least, had found a new focus already. Together with his brother, the Wichita Business Journal reported in early 2000, Hourani had launched a medical software company known as Pulse Systems during the Internet boom. The two men "underwent eight months of training from Microsoft" to bolster their chances of success, the newspaper added, with Hourani's brother even promising that "an initial public offering could be on the horizon."

**Today, Pulse Systems remains a closely held company with the Hourani brothers still in charge.**

**Pattern of Failure**

22

Meanwhile, Farha's tumultuous career at Oxford had long since come to an end. After starting work in the CEO's office in 1995, Farha had become a CEO himself -- presiding over Oxford's specialty management division -- a couple of years later. Notably, at the time, that new division ranked as Oxford's key focus during a major restructuring of the company's operations.

For a while, at least, that strategy seemed to pay off, with consumers rushing to sign up for Oxford health plans that promised immediate access to doctors -- including high-priced specialists -- of their choice. Less than a year later, however, the company became a victim of its own success. Mountains of claims overwhelmed Oxford's customized computer system, Fortune later reported, as the company's patient-friendly approach backfired in spectacular fashion.

In response, Oxford hired Aetna veteran Kevin Hickey -- a current WellCare director -- to become its new vice president of operations and counted on him to restore the company's former success. By the following year, however, both Hickey and Farha had left the company.

Hickey went on to found IntelliClaim, a privately held company that would later provide claims processing services to WellCare even as Hickey served on WellCare's board. Hickey remains a WellCare director to this day.

Meanwhile, Farha pursued his own entrepreneurial activities before accepting a job as CEO of privately held Best Doctors Inc. Farha was still running that small company, providing referral services to patients with critical illnesses, when WellCare ran into financial hardships that ultimately led to its takeover by Farha and other investors. Indeed, WellCare had previously been declared insolvent -- requiring multiple cash infusions -- before Farha took control of the company.

Under Farha's leadership, however, WellCare quickly thrived. By 2004, just two years after the buyout, Farha was ready to take the rapidly growing company public. Since then, WellCare has constantly beaten Wall Street expectations and seen its stock soar -- until now.

Today, WellCare leaders once again find themselves engulfed by challenges and faced with possible disaster. But this time around, they seem to be writing a whole new chapter for the history books.

"The high-profile raid on the company's headquarters last week by a reportedly couple hundred federal and state representatives was unprecedented in managed care," Bear Stearns analyst John Rex noted last month. "To be sure, there have been a number of fraud investigations on the facilities side of healthcare services over the last few decades, but precedents for such events in managed care are more scarce."

Thus "we remain sidelined, awaiting any indication as to scope of issues so we can actually assess contract loss risk," added Rex, whose firm seeks to do business with the companies it covers. But "chasing fraud stories in healthcare services -- alleged or real -- has been historically a tough game."

### WellCare's Actions Following the Governmental Raid

45.     On October 26, 2007, the Company announced that it had established a committee to monitor development in the various investigations of WellCare.  The Committee consists of Defendants Moszkowski, Michalik and King-Shaw (the "Special Committee").

46.     On November 5, 2007, the Company announced that the Special Committee would conduct an "independent" investigation into matters raised as part of the ongoing investigation and inquiries by certain federal and state agencies or other regulatory bodies or organizations as well as other governmental or private party proceedings that may be commenced.  According to the Company's announcement, "the special committee will also develop and recommend to the Board of Directors for its consideration any remedial measure the special committee finds may be warranted."  The Special Committee has retained the law firm of Davis Polk & Wardwell to assist in the investigation.

47.     Raising the Company announced suspicions that a restatement is in theon November 5, 2007, that it would be unable to file its Form 10-k for the year ended December 31, 2007 due to the pending investigation and that its December 31, 2007 filing might also be delayed.  While the Company announced preliminary financial results for the third quarter of 2007 in a November 5, 2007 conference call, it specifically noted that "The Company is unable at this time to assess the impact, if any, on the ongoing investigations on the Company's

previously issued historical financial statements.  Pending completion of special committee's investigation, the Company will not be providing earnings guidance."

48.    On December 6, 2007, WellCare announced in response to the ongoing government investigations, that it had adopted a new employee retention and severance program, which includes financial benefits for certain of the Company's senior officers and members of management. A December 7, 2007 Deutsche Bank Global Markets research report noted, "[T]he costs associated with this program could be significant and suggest that employee talent flight is a legitimate operational risk due to the ongoing FBI investigation."  Through this retention plan the Individual Defendants may be rewarding the very perpetrators of the pervasive Company-wide fraud.

## The Aftermath/Harm to the Company

49.    As a result of the disclosure of the fraud and misconduct at WellCare, resulting from Defendants' breaches of fiduciary duties, Standard & Poor's ("S&P") Rating Service placed its 'BB-' counterparty credit rating on WellCare on Credit Watch with negative implications.  According to an October 25, 2007 *Market News Publishing* article, S&P said it put WellCare on CreditWatch "because [they] view this investigation as a material adverse development with potentially meaningful downside consequences for the company's ongoing operation."  Additionally, trading in the Company's stock was halted on the NYSE and the stock dropped 79% over the next few days.  In January 22, 2008 article entitled, "S&P Says WellCare Ratings Still on Watch," S&P stated that it was keeping its credit rating for Wellcare on "Watch Negative", meaning that S&P could lower the Company's ratings in the near term.  The article also said:

S&P noted that Wellcare has since been named in various class action complaints, a whistleblower lawsuit, and is dealing with requests for information from the Securities and Exchange Commission and Florida state regulatory authorities.

The agency said these developments could significantly hurt the company's credit profile, particularly since WellCare has not been advised of the subject matter of the investigation and has not yet filed its quarterly earnings report for the period ended Sept. 30.

50.    On October 29, 2007, Florida's Agency for Health Care Administration ("AHCA") announced that it was taking "precautionary measures to prepare for all eventualities," in response to the October 24, 2007 raid. According to the press release, these measures include, among other things, "[d]elaying pending requests by WellCare and its affiliated companies to expand into new service areas," and "[r]equesting a review of Medicaid Managed Care contracting policies and procedures by the Medicaid Director … to identify weaknesses and opportunities for increased accountability."

51.    A number of analyst reports have noted the negative impact that the investigation has and will have on the Company's financial performance. For example, an October 24, 2007 Deutsche Bank report stated, "the investigation could clearly have a negative impact on operations and earnings should the allegations prove serious, particularly given that the news of the probe comes immediately in front of the 2008 Medicare marketing season." Additionally, a December 7, 2007 Deutsche Bank report reduced its 2007-2009 earnings estimates to reflect higher than expected SG&A costs due to the costs associated with the retention program.

52.    In a November 11, 2007 article on *The Street.com* entitled, "WellCare Looking Vulnerable," further details of the harm to the Company resulting from the Individual Defendants' misconduct, including the potential loss of state contracts, was discussed:

26

Even now, with its reputation in tatters and its stock price in the toilet, sullied **WellCare** still has plenty left to lose.

Soon, WellCare's core businesses could take a painful hit as well. Starting this month, WellCare must compete with other health insurers for Medicare customers and then convince government authorities to renew contracts for its Medicare and Medicaid policies alike. Moreover, it must do this with a heavily publicized raid of its headquarters hanging over its head.

To its credit, late Friday, WellCare announced that it has managed to execute new Medicare contracts in Illinois and a handful of smaller markets for the company. Going forward, other states could very well follow suit. Ultimately, the next seven weeks will tell the story.

On Thursday, WellCare will begin courting senior citizens during the open enrollment season for lucrative Medicare Advantage plans. Until last month's raid of the company's Florida headquarters, some experts viewed WellCare's booming Medicare Advantage business as the company's growth engine. Now, however, they see serious risks instead.

"It is hard to believe that brokers will be actively pushing the sale of WellCare-branded Medicare Advantage policies," Bear Stearns analyst John Rex wrote earlier this month. "More likely now, we could see how the company will be a net loser of Medicare Advantage business instead, being an easy target for competitors to sell against given the ongoing investigation."

Thus "we are lowering our [projections] , as we assume 10% attrition in the MA book rather than the prior growth outlook," Rex added. And "this does not incorporate contract losses, which would have a much more significant impact and cannot be ruled out."

Even if WellCare manages to win over seniors and expand -- or at least maintain -- its MA market share, the company must then officially renew some key contracts with the government. WellCare's federal contracts for many of its Medicare programs, including its popular private fee-for-service plans, expire at the end of December. **Moreover, the company's highly profitable Medicaid contracts in the state of New York -- where an investigation is reportedly brewing -- will expire over the course of the next year as well.**

WellCare faces serious risks in some other crucial markets, too. Florida, in particular, stands out. Although WellCare's current Medicaid contracts in Florida extend through the summer of 2009, the company's plans to expand its business there have been temporarily halted.

**Notably, days after last month's raid, Florida's Medicaid agency delayed WellCare's request to branch out into new service areas across the state. Now, some experts worry about WellCare's ability to hold on to the Florida Medicaid business that it already has.**

**"The Florida Medicaid market is WellCare's single largest business line, [accounting] for 39% of WellCare's total membership in 2Q07," Deutsche Bank analyst Scott Fidel stressed late last month. Based on recent figures, "WCG held a No. 1 46% market share in Florida Medicaid, followed by Amerigroup at 18%, UnitedHealth at 12% and Humana at 5%.**

"Given the rapidly deteriorating regulatory situation at WCG, we expect the other public managed care organizations currently **operating** in Florida may have significant opportunities to gain market share in Florida Medicaid from WCG" going forward.

WellCare failed to answer questions for this story. Meanwhile, the company's stock continues to suffer. The shares have lost three-quarters of their value since scandal first engulfed the company less than one month ago.

For now, at least, both Rex and Fidel are urging investors to remain on the sidelines until WellCare's future prospects become clearer. Fidel's firm owns at least 1% of WellCare's stock itself.

53.    In addition to losing valuable market share, industry analysts have accused Wellcare of engaging in an improper earnings management scheme whereby the Company has shifted profits off its book in order to obtain rate hikes from Medicaid plans.  Specifically, the November 11, 2007 *The Street.com* article stated:

**Outsized Profits**

Back in its glory days, as its stock headed toward $130 a share, WellCare may have been even more profitable than it seemed.

**For more than a year, Goldman Sachs analyst Matthew Borsch has been suggesting that WellCare shifts huge sums of money into an offshore subsidiary so that the company looks less profitable when it seeks rate increases from Medicaid officials. Late last month, Borsch followed up by saying that this arrangement has in fact cut WellCare's reported profits by nearly half. Even before then, Borsch reported that regulators in both Florida and Connecticut were scrutinizing the transactions.**

28

"WellCare has taken issue with our having reached what it deems 'inappropriate conclusions,'" Borsch acknowledged back in late May. "However, we highlight that we first approached management on this issue in June 2006 and have yet to receive an explanation that answers our questions."

Borsch was urging investors to **sell** WellCare's stock at the time. However, after the shares spiraled well below his $73 price target, he removed WellCare from his firm's "Americas Sell List" and established a neutral rating instead. His firm has investment banking ties to the company.

Meanwhile, in his past research, Borsch **indicated** that WellCare has been seriously underreporting Medicaid profits in its valu**able New York market as well. Since then, Reuters has announced that New York regulators are** investigating the company, too.

Notably, analysts have portrayed New York as an important WellCare market that delivers extraordinary profit margins for **the** company.

"WellCare's profitability level in New York has been very strong," Nersessian noted in early spring. Moreover, "WellCare's organic **Medicaid** growth opportunities are limited to one state -- New York."

54.     Finally, the November 11, 2007 *The Street.com* article notes that the Company is now facing new audits in states like Georgia and that The Company faces the prospect of large fines consuming its dwindling cash:

> **Now that prospect looks even dimmer, with Wright noting last month that Georgia officials have started auditing WellCare's payments to healthcare providers amid public outcry over the state's newly privatized Medicaid program. Due to the plunge in WellCare's share price, however, Wright has since lifted his rating on the stock back to hold.**

> To be fair, WellCare's Medicaid business in other states looks relatively safe with no contract expirations looming. Yet all of these states, besides Illinois and Ohio, rank as relatively minor markets for the company.

> Still, given the huge risks and uncertainties involved, analysts have found it virtually impossible to determine just how much WellCare is actually worth. **"There is very little in the way of so-called 'free cash' that would be left over (probably $100 million to $200 million), and fines could easily consume all of that," Rex observed this month. Meanwhile, "the fundamental 'distressed equity' valuation problem in managed care is that these companies have**

**almost nothing in the way of hard assets, with the customer contracts being the key asset" in the end.**
Thus, he added, "if/when these start unwinding, there are 'go-to-zero' scenarios for these stocks."

55.     Although, WellCare re-signed some of its contracts with the Centers for Medicare and Medicaid Services ("CMS"), a Wachovia Capital Markets analyst remarked in a January 14, 2008, note to clients, "[w]e don't think the contract renewal sheds any light onto the nature or severity of the investigation. In other words we don't think CMS has any privileged access to information about the investigation."

56.     Finally, on January 24, 2008, *The Wall Street Journal* reported that, in response to the numerous pending government fraud investigations, the WellCare Board is belatedly seeking to terminate Defendants Farha, Behrens, and Bereday.  This development further underscores the pervasive, Company-wide nature of the fraud, which was perpetrated at the highest executive ranks.  Specifically, *The Wall Street Journal* stated:

> The board of WellCare Health Plans Inc. is negotiating the departure of the company's three top executives amid a probe into fraud allegations at the managed-care provider, according to people familiar with aspects of the proceedings.

> The outcome of the talks could be announced as soon as today.

> The discussions with Chairman and Chief Executive Todd Farha, Chief Financial Officer Paul Behrens and General Counsel Thaddeus Bereday come three months after more than 200 federal and state agents raided the company's Tampa, Fla., headquarters.  WellCare runs Medicare and Medicaid managed-care plans covering 2.3 million people.

> A WellCare spokeswoman declined to comment or make the executives available for comment. Attorneys for the executives didn't return calls. Officials at the U.S. attorney's office in Tampa and an attorney for WellCare's board also declined to comment.

The board initiated the talks to secure the executives' exit, but it has taken longer than expected to iron out the details, one of the people familiar with the proceedings said. Any departures "are not a part of any settlement discussions" with authorities, this person added. The person declined to say who might replace the executives.

WellCare's shares yesterday fell $1.46, or 2.8%, to $50.94 in 4 p.m. New York Stock Exchange composite trading. The stock is at less than half its $115.17 closing price Oct. 24, the day of the raid.

The Wall Street Journal reported in early November that the investigation centers at least in part on allegations the company inflated the amount it spent on mental-health care in order to keep money it should have refunded to Florida's Medicaid program. Among other questions, authorities are investigating whether reinsurance arrangements with a Cayman Islands subsidiary allowed the company to misrepresent outlays for care.

The company has said it is cooperating with the investigation, which has involved personnel from the Federal Bureau of Investigation, the U.S. attorney's office, the Department of Health and Human Services' Office of the Inspector General and the Medicaid Fraud Control Unit in Florida Attorney General Bill McCollum's office. The company also has received a subpoena from the Securities and Exchange Commission. Connecticut Attorney General Richard Blumenthal's office is investigating as well.

### The Individual Defendants' Dissemination of False Financial Statements

57.     Beginning in the first quarter of 2006 and continuing until the government raid on WellCare's corporate headquarters, the Individual Defendants breached their fiduciary duties of care, good faith, and loyalty by causing and/or allowing WellCare to file numerous false and misleading statements and material omissions, including statements contained in the Company's annual Proxy Statements, Forms 10-Q, Forms 10-K, press releases, and analyst conference calls. Among other things, the Individual Defendants' statements caused the price of WellCare stock to trade at artificially inflated prices by causing the Company to materially overstate its revenue, earnings and net income.  In addition, the Individual Defendants caused the Company to falsely

represent that it was being operated in a lawful manner and was in compliance with applicable state and federal laws concerning Medicare and Medicaid.

58.     On February 13, 2006, WellCare issued a press release announcing its financial results for the fourth quarter and full year 2005, and concurrently filed with the SEC a report on Form 8-K that included as an exhibit the full text of the February 13, 2006 press release.  The February 13, 2006 press release touted the Company's strong revenue and earnings growth and projected continued growth for 2006 fueled by Medicare Advantage Expansion in Florida, New York, Louisiana, Connecticut and Illinois, *inter alia*, stating:

> WellCare Health Plans, Inc. (NYSE: WCG) announced its fourth quarter and full year 2005 results and updated 2006 guidance as follows:
>
> - Net income from core operations for the fourth quarter of 2005 increased 21.5% to $21.5 million, or $0.54 per diluted share, based on 39.8 million weighted average shares outstanding, compared with net income of $17.7 million, or $0.46 per diluted share, for the same period last year.
> - GAAP net income of $10.8 million for the fourth quarter of 2005, or $0.27 per diluted share, after incurring pre-tax administrative expenses of $17.5 million, or $0.27 per diluted share after tax, related to the launches of the Company's Georgia and prescription drug plan (PDP) initiatives.
> - Fourth quarter 2005 revenues increased 29% to $511.5 million compared with $397.3 million for the fourth quarter of 2004.
> - Guidance for full-year 2006 earnings per share excluding the impact of FAS 123(R) stock option expensing increased to $2.50 to $2.55, from prior guidance of $2.50, based on 40.0 million weighted average shares outstanding. This guidance includes an expected two-month delay in Georgia.
> - Including the impact of FAS 123(R), full-year 2006 GAAP earnings per share guidance is $2.37 to $2.42.
>
> "The strong performance of our core business in 2005, led by 50% growth in our Medicare membership, provides an excellent foundation for our new Georgia and PDP opportunities in 2006," said Todd S. Farha, President and Chief Executive Officer of WellCare. "We have surpassed the million member milestone, currently serving over 1.4 million members, including approximately 620,000 new members from the successful launch of our Medicare Part D plans across the country. We are pleased by the strong acceptance of our plan offerings among Medicare beneficiaries."

Results of Operations for the Fourth Quarter

Total Revenues: ***Total revenues for the fourth quarter of 2005 increased by 29% to $511.5 million compared with $397.3 million for the same period last year***. Fourth quarter 2005 revenue increases were principally attributable to the Company's membership growth and mix of members between product lines.

Medical Benefits Expense: Medical benefits expense for the fourth quarter of 2005 was $405.3 million, representing 80.2% of premium revenues, compared with $313.6 million, representing 79.3% of premium revenues for the same period last year.

Selling, General and Administrative Expense: Selling, general and administrative (SG&A) expense was $82.5 million for the fourth quarter of 2005, representing 16.1% of total revenues, compared with $49.2 million, or 12.4% of total revenues, for the same period last year. The Company continues its investment in Medicare expansion and information technology as well as general spending necessary to support its growth strategy, including its investments in its Georgia and PDP initiatives. Excluding approximately $17.5 million of administrative expenses related to the Georgia and PDP initiatives, SG&A expense related to core operations was $65.0 million for the fourth quarter of 2005, representing 12.7% of total revenues.

Net Income: ***Net income from core operations for the fourth quarter of 2005 was $21.5 million, or $0.54 per diluted share***, based on 39.8 million weighted average shares outstanding, ***compared with net income of $17.7 million, or $0.46 per diluted share***, based on 38.1 million weighted average shares outstanding ***for the same period last year***. GAAP net income for the fourth quarter of 2005 was $10.8 million, or $0.27 per diluted share, after incurring pre-tax administrative expenses of $17.5 million, or $0.27 per diluted share after tax, related to the Company's Georgia and PDP initiatives.

Results of Operations for the Year

Total Revenues: ***Total revenues for the year ended December 31, 2005 increased $484.3 million, or 35%, to $1.9 billion, compared with $1.4 billion for the same period last year***. 2005 revenue increases were principally attributable to the Company's membership growth, mix of members between product lines, and the Harmony acquisition.

Medical Benefits Expense: Medical benefits expense for the year ended December 31, 2005 was $1.5 billion, representing 81.2% of premium revenues, compared with $1.1 billion, representing 80.9% of premium revenues for the same period last year.

Selling, General and Administrative Expense: SG&A expense was $259.5 million for the year ended December 31, 2005, representing 13.8% of total revenues, compared with $171.3 million, or 12.3% of total revenues, for the same period last year. Excluding approximately $24.2 million of administrative expenses related to the PDP and Georgia initiatives, SG&A expense related to core operations was $235.3 million for the year ended December 31, 2005, representing 12.5% of total revenues.

Net Income: *Net income from core operations for the year ended December 31, 2005 was $66.7 million, or $1.70 per diluted share*, based on 39.3 million weighted average shares outstanding, *compared with net income of $49.3 million, or $1.56 per diluted share*, based on 31.6 million weighted average shares outstanding *for the same period last year*. GAAP net income for the year ended December 31, 2005 was $51.9 million, or $1.32 per diluted share, after incurring pre-tax administrative expenses of $24.2 million, or $0.38 per diluted share after tax, related to the Company's Georgia and PDP initiatives.

*          *          *

Growth Initiatives

*Medicare Advantage Expansion. During 2005, the Company achieved 50% growth in its Medicare Advantage membership. Since the passage of the Medicare Modernization Act of 2003, the Company has more than tripled the number of counties in its service territory and quadrupled its Medicare product offerings. For 2006, the Company now serves 50 counties in six states through its Medicare Advantage products. The significant growth in 2005 reflects strong regional sales performance in the Company's Florida and New York markets as well as growth in its newer expansion markets of Louisiana, Connecticut and Illinois.*

Medicare Prescription Drug Plan Benefits. On January 1, 2006, the Company commenced offering its stand-alone prescription drug plans under Medicare Part D in all 34 PDP regions established by the Centers for Medicare & Medicaid Services. At the beginning of 2006, the Company had approximately 620,000 PDP plan members, including auto-assigned dual eligibles and members who have selected the Company's plans.

During 2005, the Company incurred pre-tax administrative expenses of $19.6 million, or $0.30 per diluted share after tax, related to infrastructure, technology and systems to launch its PDP initiative. These expenses negatively impacted the Company's net income in the second, third and fourth quarters of 2005.

Georgia Expansion. In July 2005, the Company was awarded Medicaid managed care contracts by the Georgia Department of Community Health (DCH), pursuant to which DCH is expected to transition approximately 1.1 million Medicaid and

34

S-CHIP beneficiaries to Medicaid managed care plans. Although the DCH has not yet announced any delay in the official launch date of April 1, 2005, for planning purposes, the Company is anticipating a potential two-month delay in the transition date for this new program. In August 2005, the Company also began offering Medicare services to beneficiaries in Fulton and DeKalb counties in Georgia, which represent 140,000 eligible enrollees. The Company incurred pre-tax administrative expenses of $4.6 million, or $0.07 per diluted share after tax, related to the Georgia expansion in the third and fourth quarters of 2005.

(Emphasis added.)

59.     On February 16, 2006, WellCare filed with the SEC its annual report on Form 10-K, signed by Defendants Farha, Behrens, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski, which reiterated the financial results reported in the February 13, 2006 press release and Form 8-K.  With respect to the Company's operations in Florida, New York, and Connecticut, the Form 10-K stated:

*Florida*

We are the largest operator of Medicaid managed care plans in Florida. We began providing Medicaid services in Florida in 1994, and now operate the two largest Medicaid managed care plans in the state under the names Staywell and HealthEase, which operate in 15 counties and 30 counties, respectively. We also participate in Florida's S-CHIP program, known as Healthy Kids. We began providing MCC services in Florida in 2000 and now operate our MCC plan in 22 counties under the WellCare name. During 2006, our overall membership in Florida decreased from approximately 545,000 members to approximately 525,000 members.

*                *                *

*New York*

Our New York plan began operations in 1985. We currently offer Medicaid plans in 12 counties in the State of New York. We also offer Child Health Plus, Family Health Plus and Medicaid Advantage plans for dual-eligibles. We operate MCC plans in 14 counties in New York. We provide both our Medicaid and MCC plans under the WellCare name. During 2006, our overall New York membership grew from approximately 95,000 members to approximately 117,000 members.

*                *                *

35

*Connecticut*

In Connecticut, we operate our Medicaid managed care plans under the name PreferredOne and our MCC plans under the WellCare name. Our Connecticut plan began operations in 1995. We currently offer Medicaid plans in each of Connecticut's eight counties and MCC plans in three Connecticut counties. During 2006, our total Connecticut membership grew from approximately 37,000 members to approximately 39,000 members. Our Medicaid contracts with the State of Connecticut expire on June 30, 2007 and our Connecticut Medicare contract with CMS expires on December 31, 2007.

60.     Under the heading "Growth Strategy," the Form 10-K stated:

Our objective is to be the leading provider of managed care services for government-sponsored healthcare programs. To achieve this objective, we intend to expand our Medicaid business within our existing markets, leverage our established Medicaid business to continue to develop Medicare plans and enter new Medicaid and Medicare markets through internal growth, expansion of our current service territory, new product initiatives and selective acquisitions. For example, during 2006, we successfully launched our PDP and Georgia, Ohio and Missouri Medicaid plans.

61.     Under the heading "Corporate Compliance," the Form 10-K touted the Company's "Trust Program," for assuring WellCare's compliance with "increasingly complex" legal issues facing the healthcare industry by training directors and officers to "detect possible violations," stating:

Due to the increasingly complex legal and ethical questions facing all participants in the healthcare industry, we have unified our corporate ethics and compliance policies by implementing a comprehensive corporate ethics and compliance program, called the Trust Program. ***The Trust Program covers all aspects of our company and is designed to assist us with conducting our business in accordance with applicable federal and state laws and high standards of business ethics***. The Trust Program applies to members of our board of directors, our executive team, our associates, and in some cases, our business partners and our independent contractors. We intend to disclose any future amendments to or waivers from the Trust Program, if any, made with respect to our directors and executive officers on our Internet site.

36

> *We maintain and update training and monitoring programs to educate our directors, executives, and associates and independent contractors on the legal and regulatory requirements of their respective duties and positions and to detect possible violations*. To help ensure compliance with the Trust Program, we also undergo regular, periodic compliance audits by internal and external auditors and compliance staff who have expertise in federal and state healthcare laws and regulations.

(Emphasis added.)

62.    Finally, the Form 10-K was certified by Defendants Farha and Behrens pursuant to Certification of President and Chief Executive Officer pursuant to Section 302 of Sarbanes-Oxley Act of 2002, as follows:

63.    In addition, Defendants Farha and Behrens certified the Form 10-K pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that "the information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company."

| | |
|---|---|
| 1. | I have reviewed this Annual Report on Form 10-K of WellCare Health Plans, Inc.; |
| 2. | Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; |
| 3. | Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report; |
| 4. | The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have: |
| | a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; |

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

64.    On April 28, 2006, WellCare filed with the SEC a proxy statement on Form DEF 14A, in which Defendants touted the Company's Trust Program for assuring WellCare's compliance with "increasingly complex" legal issues facing the healthcare industry by training directors and officers to "detect possible violations," stating:

> Due to the increasingly complex ethical and legal questions facing all participants in the healthcare industry, we have unified our corporate ethics and compliance policies by implementing a comprehensive corporate ethics and compliance program, called the Trust Program. ***The Trust Program covers all aspects of our company and is designed to assist us with conducting our business in accordance with applicable federal and state laws and high standards of business ethics. The Trust Program applies to members of our board, our associates, including our chief executive officer, chief financial officer and our principal accounting officer or controller*** and, in some cases, our business partners and independent contractors. The Trust Program contains the following elements:

- written standards of conduct;
- designation of a corporate compliance officer and compliance committee;
- effective training and education;
- effective lines for reporting and communication;
- enforcement of standards through disciplinary guidelines and actions;
- internal monitoring and auditing; and
- prompt response to detected offenses and development of corrective action plans.

*We maintain and update training and monitoring programs to educate our directors, associates, business partners and independent contractors on the legal and regulatory requirements of their respective duties and positions and to detect possible violations*. To help ensure compliance with the Trust Program, we also conduct regular, periodic compliance audits by internal and external auditors and compliance staff who have expertise in federal and state healthcare laws and regulations.

The Trust Program contains a whistleblower policy which sets forth the steps an associate should take if he or she has a question about the application of the program. The whistleblower policy contained in the Trust Program also sets forth the audit committee's procedures for the receipt, retention and treatment of complaints received from associates regarding accounting, internal accounting controls or auditing matters as required by the Sarbanes-Oxley Act of 2002.

(Emphasis added.)

65.     On May 8, 2006, the Company issued a press release, entitled "WellCare Doubles Membership Delivering 58% Earnings Growth," announcing the Company's financial results for the first quarter of 2006, and concurrently filed with the SEC a report on Form 8-K, signed by Defendant Farha, which included as an exhibit the full text of the May 8, 2006 press release. The May 8, 2006 press release touted the Company's strong revenue and earnings growth, including a 74% increase in total revenue and a  58% increase in net income, *inter alia*, stating:

WellCare Health Plans, Inc. (NYSE: WCG) today announced that net income for the first quarter of 2006 increased 58% to $16.8 million, or $0.42 per diluted share, based on 40.0 million weighted average shares outstanding, compared with net income of $10.6 million, or $0.27 per diluted share, based on 39.5 million weighted average shares outstanding for the same period last year. First quarter

2006 revenues increased 74% to $730.4 million compared with $418.9 million for the first quarter of 2005.

*        *        *

Total Revenues: Total revenues in the first quarter of 2006 increased 74% to $730.4 million compared with $418.9 million for the same period last year. First quarter 2006 revenue increases were principally attributable to the Company's strong growth in Medicaid and Medicare membership, including the addition of the Company's PDP products.

Medical Benefits Expense: Medical benefits expense for the first quarter of 2006 was $599.1 million, representing 83.0% of premium revenues, compared with $344.9 million representing 82.9% of premium revenues for the same period last year.

Selling, General and Administrative Expense: Selling, general and administrative (SG&A) expense was $97.3 million for the first quarter of 2006, representing 13.3% of total revenues, compared with $51.2 million, or 12.2% of total revenues, for the same period last year. The increase in SG&A expense was primarily due to increased spending necessary to support and sustain our membership growth.

Net Income: Net income for the first quarter of 2006 was $16.8 million, or $0.42 per diluted share, based on 40.0 million weighted average shares outstanding, compared with net income of $10.6 million, or $0.27 per diluted share, based on 39.5 million weighted average shares outstanding for the same period last year.

66.    Under the heading "Growth Initiatives," the May 8, 2006 press release stated:

Medicare Prescription Drug Plan Benefits. On January 1, 2006, the Company commenced offering its national stand-alone prescription drug plans under Medicare Part D in all 34 PDP regions established by the Centers for Medicare & Medicaid Services. As of March 31, 2006, the Company had approximately 703,500 PDP members, net of the Company's estimates of enrollments and disenrollments.

Georgia Expansion . In 2005, the Company was awarded Medicaid managed care contracts by the Georgia Department of Community Health (DCH), pursuant to which DCH is expected to transition approximately 1.1 million Medicaid and S-CHIP beneficiaries to Medicaid managed care plans. The Company anticipates a June 1, 2006, transition date for the Atlanta and Central regions. The Company also anticipates that the remaining four Georgia regions will transition to managed care on September 1, 2006, according to the state's scheduled implementation timeline.

67.    Commenting on these results, Defendant Farha stated:

We continue to achieve industry-leading growth through new product and geographic expansions... We are pleased to participate in the federal government's groundbreaking effort to extend prescription drug coverage to our nation's seniors, and we now rank among the top five PDPs nationally. Our focus on execution and operating discipline remains a competitive advantage, differentiating WellCare from other providers of government-sponsored managed care programs.

68.    On May 9, 2006, WellCare filed with the SEC a quarterly report on Form 10-Q for first quarter of 2006, signed by Defendant Behrens, in which the Company reiterated the financial results set forth in the May 8, 2006 press release. The first quarter 2006 Form 10-Q contained certifications by Defendants Farha and Behrens, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that were substantially identical to their certifications of the Form 10-K. Defendants Farha and Behrens also certified the Form 10-Q pursuant to Section 906 of the Sarbanes Oxley Act of 2002 that "the information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company."

69.    Under the heading "Evaluation of Disclosure Controls and Procedures," the first quarter 2006 Form 10-Q represented that Defendants had established effective disclosure controls and procedures, stating:

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision and with the participation of our President and Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 under the Exchange Act ("Disclosure Controls"). Based on the evaluation, our CEO and CFO concluded that as of March 31, 2006, our Disclosure Controls are effective in timely alerting them to material information required to be included in our reports filed with the SEC.

70.    On August 2, 2006, the Company issued a press release entitled, "WellCare Tops Two Million Members Delivering 57% Earnings Growth," in which the Company announced its

financial results for the second quarter of 2006, and concurrently filed with the SEC a report on

Form 8-K, signed by Defendant Farha, which included as an exhibit the full text of the August 2,

2006 press release.  The August 2, 2006 press release touted the Company's strong revenue and

earnings growth, including a 88% increase in total revenue and a 58% increase in net income and

attributed the revenue increases principally "to the Company's strong growth in Medicaid and

Medicare membership," *inter alia*, stating:

> WellCare Health Plans, Inc. (NYSE: WCG) today announced that net income for
> the second quarter of 2006 increased 56.7% to $22.2 million, or $0.55 per diluted
> share, based on 40.6 million weighted average shares outstanding, compared with
> net income of $14.2 million, or $0.36 per diluted share, based on 38.9 million
> weighted average shares outstanding for the same period last year. Second quarter
> 2006 revenues increased 88.0% to $852.8 million compared with $453.7 million
> for the second quarter of 2005. The Company is raising its previously issued 2006
> guidance of revenues of $3.4 billion and earnings per diluted share in the range of
> $2.52 to $2.57, based on 40.4 million weighted average shares outstanding.
>
> >           *                    *                    *
>
> **Results of Operations for the Second Quarter**
> Total Revenues: Total revenues in the second quarter of 2006 increased 88.0% to
> $852.8 million compared with $453.7 million for the same period last year.
> Second quarter 2006 revenue increases were principally attributable to the
> Company's strong growth in Medicaid and Medicare membership, including the
> addition of the Company's PDP products and its new Georgia Medicaid health
> plan.
>
> Medical Benefits Expense: Medical benefits expense for the second quarter of
> 2006 was $705.0 million, representing 83.7% of premium revenues, compared
> with $365.8 million, representing 81.3% of premium revenues, for the same
> period last year. The medical benefits ratio increased primarily as a result of the
> seasonally higher medical benefits expense ratios associated with the Company's
> PDP business in its Medicare segment.
>
> Selling, General and Administrative Expense: Selling, general and administrative
> (SG&A) expense for the second quarter of 2006 was $104.6 million, representing
> 12.3% of total revenues, compared with $59.1 million, or 13.0% of total revenues,
> for the same period last year.
>
> Net Income: Net income for the second quarter of 2006 was $22.2 million, or
> $0.55 per diluted share, based on 40.6 million weighted average shares

outstanding, compared with net income of $14.2 million, or $0.36 per diluted share, based on 38.9 million weighted average shares outstanding for the same period last year.

71.    Commenting on these results, Defendant Farha stated:

WellCare associates are proud to serve over 2,000,000 members nationwide… We are pleased with our transformation into a leading national government healthcare company.  Our operating discipline and focus one execution continue to drive our strong growth.

72.    On August 4, 2006, WellCare filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2006, signed by Defendant Behrens, in which the Company reiterated the financial results set forth in the August 2, 2006 press release.  The second quarter 2006 Form 10-Q contained certifications by Defendants Farha and Behrens, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that were substantially identical to their certifications of the Form 10-K.  Defendants Farha and Behrens also certified the Form 10-Q pursuant to Section 906 of the Sarbanes Oxley Act of 2002 that "The information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company."

73.    Under the heading "Evaluation of Disclosure Controls and Procedures," the second quarter 2006 Form 10-Q represented that Defendants had established effective disclosure controls and procedures, stating:

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision and with the participation of our President and Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 under the Exchange Act ("Disclosure Controls"). Based on the evaluation, our CEO and CFO concluded that as of June 30, 2006, our Disclosure Controls are effective in timely alerting them to material information required to be included in our reports filed with the SEC.

43

74.     On November 1, 2006, WellCare issued a press release entitled, "WellCare Announces Third Quarter Results: $1 Billion in Revenues; $1.06 Diluted Earnings Per Share," announcing the Company's financial results for the third quarter of 2006, and concurrently filed with the SEC a report on Form 8-K, signed by Defendant Farha, which included as an exhibit the full text of the November 1, 2006 press release.  The November 1, 2006 press release touted the Company's strong revenue and earnings growth, including a 104% increase in total revenue and a 166% increase in net income as compared to the same period in 2005, *inter alia*, stating:

> WellCare Health Plans, Inc. (NYSE: WCG) today announced that net income for the third quarter of 2006 increased 166% to $43.3 million, or $1.06 per diluted share, based on 41.0 million weighted average shares outstanding, compared with net income of $16.3 million, or $0.41 per diluted share, based on 39.7 million weighted average shares outstanding for the same period last year. Third quarter 2006 revenues increased 104% to $1.0 billion compared with $495.5 million for the third quarter of 2005.
>
> *                    *                    *
>
> The Company also announced that its Board of Directors has acted unanimously to elect Mr. Farha to serve as Chairman of the Board, effective October 26, 2006. Mr. Farha has served as the Company's President and Chief Executive Officer since 2002 and will continue in that capacity. Neal Moszkowski, the Company's past Chairman and the co-CEO of TowerBrook Capital Partners L.P., will continue his service as a director and his roles on various Board committees. "This is a natural progression for Mr. Farha who has led the Company extremely capably," said Mr. Moszkowski. "Under Mr. Farha's leadership, WellCare's operating discipline has distinguished the Company as the industry standard. All stakeholders will benefit greatly from Mr. Farha's continuing vision as the Company's Chairman and Chief Executive Officer."
>
> **Results of Operations for the Third Quarter**
> Total Revenues: Total revenues in the third quarter of 2006 increased 104% to $1.0 billion compared with $495.5 million for the same period last year. Third quarter 2006 revenue increases were principally attributable to the Company's strong growth in membership, primarily due to the addition of the Company's PDP products and its new Georgia Medicaid health plan.
>
> Medical Benefits Expense: Medical benefits expense for the third quarter of 2006 was $802.9 million, representing 80.8% of premium revenues, compared with

$396.1 million, representing 80.7% of premium revenues, for the same period last year.

Selling, General and Administrative Expense: Selling, general and administrative (SG&A) expense for the third quarter of 2006 was $124.9 million, representing 12.4% of total revenues, compared with $66.7 million, or 13.5% of total revenues, for the same period last year.

Net Income: Net income for the third quarter of 2006 was $43.3 million, or $1.06 per diluted share, based on 41.0 million weighted average shares outstanding, compared with net income of $16.3 million, or $0.41 per diluted share, based on 39.7 million weighted average shares outstanding, for the same period last year.

**Growth Initiatives**

Medicare Prescription Drug Plans. On January 1, 2006, the Company commenced offering its national stand-alone prescription drug plans under Medicare Part D in all 34 PDP regions established by the Centers for Medicare & Medicaid Services (CMS). As of September 30, 2006, the Company had approximately 911,000 PDP members.

Georgia Expansion. The Company launched new Medicaid health plans in Georgia on June 1, 2006, in the Atlanta and Central regions. In September and October 2006, the four remaining Georgia regions transitioned to managed care. The Company was the only health plan selected to provide Medicaid services on a statewide basis in Georgia. As of September 30, 2006, the Company had approximately 410,000 Georgia members.

Private Fee-For-Service (PFFS) Plans. The Company recently announced that it had received approval from CMS to begin offering PFFS plans in over 700 counties in 38 states and Washington, D.C. Medicare beneficiaries who choose the Company's offerings will begin receiving coverage on January 1, 2007.

Ohio Expansion. The Company recently announced that it was selected to offer services to the State of Ohio's Medicaid managed care program for the aged, blind and disabled population in the northeast region of the state. In addition, the State of Ohio has indicated that WellCare will also participate in the northeast region managed care expansion of the Covered Families and Children program effective November 1, 2006.

75.     Commenting on these results, Defendant Farha stated:

We doubled the size of the Company over the past year and retained our focus on execution and operational discipline... We continue our focus on the needs of seniors, families and underserved populations to deliver higher quality healthcare

45

at lower cost to our government partners.  In 2007, we will continue our growth by launching Medicare private fee-for-service plan offerings and our Medicaid expansions in the northeast region of Ohio.

76.     The November 1, 2006 press release also announced the unanimous decision of the Board to elect Defendant Farha as Chairman of the Board, effective October 26, 2006. Defendant Moszkowski, the past Chairman of WellCare stated in the press release, "this is a natural progression for Mr. Farha who has led the Company extremely capably.  Under Mr. Farha's leadership, WellCare's operating discipline has distinguished the Company as the industry standard.  All stakeholders will benefit greatly from Mr. Farha's continuing vision as the Company's Chairman and Chief Executive Officer."

77.     On November 3, 2006, WellCare filed with the SEC a quarterly report on Form 10-Q for the third quarter of 2006, signed by Defendant Behrens, in which the Company reiterated the financial results reported in the November 3, 2006 press release.  The third quarter 2006 Form 10-Q contained certifications by Defendants Farha and Behrens, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that were substantially identical to their certifications of the Form 10-K.  Defendants Farha and Behrens also certified the Form 10-Q pursuant to Section 906 of the Sarbanes Oxley Act of 2002 that "The information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company."

78.     Under the heading "Evaluation of Disclosure Controls and Procedures," the third quarter 2006 Form 10-Q represented that Defendants had established effective disclosure controls and procedures, stating:

> Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the

supervision and with the participation of our President and Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 under the Exchange Act ("Disclosure Controls"). Based on the evaluation, our CEO and CFO concluded that as of September 30, 2006, our Disclosure Controls are effective in timely alerting them to material information required to be included in our reports filed with the SEC.

79.    On February 13, 2007, the Company issued a press release entitled "WellCare Announces Fourth Quarter and Full-Year 2006 Results, $1.2 Billion In Quarterly Revenues; $1.38 Diluted Earnings Per Share," in which Defendants announced the Company's financial results for the fourth quarter and full-year 2006, and Defendants concurrently filed with the SEC a report on Form 8-K, signed by Defendant Farha, which included as an exhibit the full text of the February 13, 2007 press release.  The February 13, 2007 press release touted the Company's strong revenue and earnings growth, including a 129% increase in total revenue and a 425.5% in the fourth quarter of 2006, as compared to the same period in 2005.  The Company attributed the revenue increases principally to "the Company's strong growth in membership, primarily due to the addition of the company's PDP products and the launch of its Georgia Medicaid health plan." In particular, the February 13, 2007 press release stated:

> WellCare Health Plans, Inc. (NYSE: WCG) today announced that net income for the fourth quarter of 2006 increased 425.5% to $57.0 million, or $1.38 per diluted share, based on 41.2 million weighted average shares outstanding, compared with net income of $10.8 million, or $0.27 per diluted share, based on 39.7 million weighted average shares outstanding for the same period last year. Fourth quarter 2006 revenues increased 129.0% to $1.2 billion compared with $511.5 million for the fourth quarter of 2005.
>
> *                *                *
>
> Results of Operations for the Fourth Quarter
> Total Revenues: Total revenues in the fourth quarter of 2006 increased 129.0% to $1.2 billion compared with $511.5 million for the same period last year. Fourth quarter 2006 revenue increases were principally attributable to the Company's strong growth in membership, primarily due to the addition of the Company's PDP products and the launch of its Georgia Medicaid health plan.

Medical Benefits Expense: Medical benefits expense for the fourth quarter of 2006 was $905.2 million, representing 78.4% of premium revenues, compared with $405.3 million, representing 80.2% of premium revenues, for the same period last year.

Selling, General and Administrative Expense: Selling, general and administrative (SG&A) expense for the fourth quarter of 2006 was $166.0 million, representing 14.2% of total revenues, compared with $82.5 million, or 16.1% of total revenues, for the same period last year, which included costs to prepare for the launch of PDP and Georgia.

Net Income: Net income for the fourth quarter of 2006 was $57.0 million, or $1.38 per diluted share, based on 41.2 million weighted average shares outstanding, compared with net income of $10.8 million, or $0.27 per diluted share, based on 39.7 million weighted average shares outstanding, for the same period last year.

Results of Operations for the Year
Total Revenues: Total revenues for the year ended December 31, 2006 increased $1.9 billion, or 100.2%, to $3.8 billion, compared with $1.9 billion for the same period last year. 2006 revenue increases were principally attributable to the Company's membership growth, including the launch of PDP and Georgia, and mix of members between product lines.

Medical Benefits Expense: Medical benefits expense for the year ended December 31, 2006 was $3.0 billion, representing 81.1% of premium revenues, compared with $1.5 billion, representing 81.2% of premium revenues for the same period last year.

Selling, General and Administrative Expense: SG&A expense was $492.8 million for the year ended December 31, 2006, representing 13.1% of total revenues, compared with $259.5 million, or 13.8% of total revenues, for the same period last year.

Net Income: Net income for the year ended December 31, 2006 was $139.2 million, or $3.43 per diluted share, based on 40.6 million weighted average shares outstanding, compared with net income of $51.9 million, or $1.32 per diluted share, based on 39.3 million weighted average shares outstanding, for the same period last year.

80.     Commenting on these results, Defendant Farha stated:

48

2006 was a transformative year for WellCare… We added over 1.4 million members and doubled our revenue without losing focus on delivering high service levels to our providers and members. We look forward to building on our strong 2006 results in 2007 and in future years.

81.     On February 16, 2007, WellCare filed with the SEC its annual report on Form 10-K, signed by Defendants Farha, Behrens, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski, which reiterated the financial results reported in the February 13, 2006 press release and Form 8-K.  With respect to the Company's operations in Florida, New York, and Connecticut, the Form 10-K stated:

Florida

We are the largest operator of Medicaid managed care plans in Florida. We began providing Medicaid services in Florida in 1994, and now operate the two largest Medicaid managed care plans in the state under the names Staywell and HealthEase, which operate in 15 counties and 30 counties, respectively. We also participate in Florida's S-CHIP program, known as Healthy Kids. We began providing MCC services in Florida in 2000 and now operate our MCC plan in 22 counties under the WellCare name. During 2006, our overall membership in Florida decreased from approximately 545,000 members to approximately 525,000 members.

                    *               *               *

New York

Our New York plan began operations in 1985. We currently offer Medicaid plans in 12 counties in the State of New York. We also offer Child Health Plus, Family Health Plus and Medicaid Advantage plans for dual-eligibles. We operate MCC plans in 14 counties in New York. We provide both our Medicaid and MCC plans under the WellCare name. During 2006, our overall New York membership grew from approximately 95,000 members to approximately 117,000 members.

                    *               *               *

Connecticut

In Connecticut, we operate our Medicaid managed care plans under the name PreferredOne and our MCC plans under the WellCare name. Our Connecticut plan began operations in 1995. We currently offer Medicaid plans in each of Connecticut's eight counties and MCC plans in three Connecticut counties. During 2006, our total Connecticut membership grew from approximately 37,000 members to approximately 39,000 members. Our Medicaid contracts with the

49

State of Connecticut expire on June 30, 2007 and our Connecticut Medicare contract with CMS expires on December 31, 2007.

82.     Under the heading "Our Growth Strategy," the Form 10-K stated:

Our objective is to be the leading provider of managed care services for government-sponsored healthcare programs. To achieve this objective, we intend to expand our Medicaid business within our existing markets, leverage our established Medicaid business to continue to develop Medicare plans and enter new Medicaid and Medicare markets through internal growth, expansion of our current service territory, new product initiatives and selective acquisitions. For example, during 2006, we successfully launched our PDP and Georgia, Ohio and Missouri Medicaid plans.

83.     Under the heading "Corporate Compliance," the Form 10-K touted the Company's "Trust Program," for assuring WellCare's compliance with "increasingly complex" legal issues facing the healthcare industry by training directors and officers to "detect possible violations," stating:

Due to the increasingly complex legal and ethical questions facing all participants in the healthcare industry, we have unified our corporate ethics and compliance policies by implementing a comprehensive corporate ethics and compliance program, called the Trust Program. ***The Trust Program covers all aspects of our company and is designed to assist us with conducting our business in accordance with applicable federal and state laws and high standards of business ethics. The Trust Program applies to members of our board of directors, our executive team, our associates***, and in some cases, our business partners and our independent contractors. We intend to disclose any future amendments to or waivers from the Trust Program, if any, made with respect to our directors and executive officers on our Internet site.

***We maintain and update training and monitoring programs to educate our directors, executives, and associates and independent contractors on the legal and regulatory requirements of their respective duties and positions and to detect possible violations.*** To help ensure compliance with the Trust Program, we also undergo regular, periodic compliance audits by internal and external auditors and compliance staff who have expertise in federal and state healthcare laws and regulations.

(Emphasis added.)

84.     Finally, the Form 10-K includes certifications by Defendants Farha and Behrens pursuant to Section 302 of Sarbanes-Oxley Act of 2002 that are substantially identical to their certifications of prior SEC filings.  In addition, Defendants Farha and Behrens certified the Form 10-K pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that "The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company."

85.     On April 27, 2007, WellCare filed with the SEC a proxy statement on Form DEF 14A, in which Defendants touted the Company's Trust Program for assuring WellCare's compliance with "increasingly complex" legal issues facing the healthcare industry by training directors and officers to "detect possible violations," stating:

> Due to the increasingly complex ethical and legal questions facing all participants in the healthcare industry, we have unified our corporate ethics and compliance policies by implementing a comprehensive corporate ethics and compliance program, called the Trust Program. The Trust Program covers all aspects of our company and is designed to assist us with conducting our business in accordance with applicable federal and state laws and high standards of business ethics. The Trust Program applies to members of our board, our associates, including our chief executive officer, chief financial officer and our principal accounting officer or controller and, in some cases, our business partners and independent contractors. The Trust Program contains the following elements:
>
> • Written standards of conduct;
>
> • Designation of a corporate compliance officer and compliance committee;
>
> • Effective training and education;
>
> • Effective lines for reporting and communication;
>
> • Enforcement of standards through disciplinary guidelines and actions;
>
> • Internal monitoring and auditing; and

- Prompt response to detected offenses and development of corrective action plans.

We maintain and update training and monitoring programs to educate our directors, associates, business partners and independent contractors on the legal and regulatory requirements of their respective duties and positions and to detect possible violations. To help ensure compliance with the Trust Program, we also conduct regular, periodic compliance audits by internal and external auditors and compliance staff who have expertise in federal and state healthcare laws and regulations.

The Trust Program contains a whistleblower policy that sets forth the steps an associate should take if he or she has a question about the application of the program. The whistleblower policy contained in the Trust Program also sets forth the audit committee's procedures for the receipt, retention and treatment of complaints received from associates regarding accounting, internal accounting controls or auditing matters as required by the Sarbanes-Oxley Act of 2002.

86.     On May 7, 2007, WellCare issued a press release announcing its financial results for the first quarter of 2007 and concurrently filed with the SEC a report on Form 8-K, signed by Defendant Farha, that included as an exhibit the full text of the May 7, 2007 press release. The May 7, 2007 press release touted the Company's strong revenue and earnings growth, including a 49% increase in net income as compared to the same period in 2006, *inter alia*, stating:

WellCare Health Plans, Inc. (NYSE: WCG) today announced first quarter 2007 net income of $25.0 million, up 49% over the first quarter 2006. Diluted earnings per share (EPS) of $0.60 increased from $0.42 in the same period last year. Membership grew 47% to 2.27 million as of March 31, 2007, yielding revenue growth of 70% to $1.24 billion.

*                    *                    *

**Highlights of First Quarter Operations**
*Total Revenues*: Total revenues for the quarter rose 70% year over year to $1.24 billion. The growth was attributable principally to the increase in the Company's membership, including the launch of the Georgia Medicaid health plan, which began operations in June 2006, as well as growth in the Medicare prescription drug plan (PDP) product. In addition, Medicare Advantage membership growth was 77% year over year and 46% year to date.

*Medical Benefits Expense*: Medical benefits expense was $1.02 billion, compared with $599 million for the same period last year. The medical benefits ratio was 83.8%, compared with 84.5% in 2006, excluding the 1.5% impact of the net reinsurance recovery for the Company's Medicare PDP product. Including the reinsurance recovery, the first quarter 2006 medical benefits ratio was 83.0%. As previously disclosed, WellCare did not renew its PDP reinsurance in 2007. The decrease in the ratio was due primarily to better than expected retention of PDP members, which resulted in improved formulary compliance and increased generic fill rates. The positive performance of the PDP product is a significant contributor to the Company's improved outlook for 2007. Please refer to the supplemental information for a reconciliation of the medical benefits ratio excluding the impact of the 2006 net reinsurance recovery.

*Selling, General, and Administrative (SG&A) Expense*: SG&A expense was $166.6 million, representing 13.4% of total revenues, compared with $97.3 million, or 13.3% of total revenues, for the same period last year. The increase in SG&A expense is in line with the expansion of WellCare's membership and operations.

87.     On May 9, 2007, WellCare filed with the SEC a quarterly report on Form 10-Q for first quarter of 2007, signed by Defendant Behrens, in which the Company reiterated the financial results set forth in the May 7, 2007 press release.  The first quarter 2007 Form 10-Q contained certifications by Defendants Farha and Behrens, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that were substantially identical to their certifications of the Form 10-K.  Defendants Farha and Behrens also certified the Form 10-Q pursuant to Section 906 of the Sarbanes Oxley Act of 2002 that "the information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company."

88.     Under the heading "Evaluation of Disclosure Controls and Procedures," the first quarter 2007 Form 10-Q represented that Defendants had established effective disclosure controls and procedures, stating:

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision and with the participation of our Chairman, President and Chief

Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 under the Exchange Act ("Disclosure Controls"). Based on the evaluation, our CEO and CFO concluded that as of March 31, 2007, our Disclosure Controls are effective in timely alerting them to material information required to be included in our reports filed with the SEC.

89.     On August 2, 2007, the Company issued a press release entitled, "WellCare Tops Two Million Members Delivering 57% Earnings Growth," in which the Company announced its financial results for the second quarter of 2007, and concurrently filed with the SEC a report on Form 8-K, signed by Defendant Farha, which included as an exhibit the full text of the August 2, 2007 press release.  The August 2, 2007 press release touted the Company's strong revenue and earnings growth, including a 88% increase in total revenue and a 58% increase in net income and attributed the revenue increases principally "to the Company's strong growth in Medicaid and Medicare membership," *inter alia*, stating:

> WellCare Health Plans, Inc. (NYSE: WCG) today announced second quarter 2007 net income of $54.6 million, up 146% over the second quarter 2006.  Diluted earnings per share (EPS) was $1.30 versus $0.55 in the same period last year, a 136% increase.  Membership grew over 14% to 2.3 million as of June 30, 2007, yielding total revenues of $1.34 billion, up 57% over the prior year.
>
> **Highlights of Second Quarter Operations**
> Total *Revenues*: Total revenues for the second quarter 2007 rose 57% year over year to $1.34 billion.  The growth is attributable principally to the increase in the Company's membership, including the launch of the Georgia Medicaid health plan which began operations in June 2006, as well as growth in Medicare products.  Medicare Advantage membership growth was 87% year over year and 72% year to date.
>
> *Medical Benefits Expenses*: Medical benefits expenses were $1.08 billion, compared with $705.0 million for the same period last year.  The medical benefits ratio was 82.0% compared with 82.4% in 2006, excluding the 1.3% impact of the 2006 net reinsurance charge for the Company's Medicare prescription drug plan (PDP) product. Including the reinsurance charge, the second quarter 2006 medical benefits ratio was 83.7%. As previously disclosed, WellCare did not renew its PDP reinsurance in 2007. The 40 basis point improvement in the

medical benefits ratio was due primarily to high retention of PDP members, which resulted in improved formulary compliance and increased generic fill rates, offset partially by an expected increase in the Medicaid medical benefits ratio. Please refer to the supplemental information for a reconciliation of the medical benefits ratio excluding the impact of the 2006 net reinsurance charge.

*Selling, General, and Administrative (SG&A) Expenses*: SG&A expenses were $160.9 million, representing 12.0% of total revenues, compared with $104.6 million, or 12.3% of total revenues, for the same period last year.  The increase in SG&A expenses is in line with the expansion of WellCare's operations and growth initiatives.

**Cash Flow and Financial Condition Highlights**
For the six months ended June 30, 2007, the Company's net cash provided by operations was $209.9 million, or 2.6 times net income, after adjusting for the timing of receipt of payments from the Company's government partners. Please refer to the supplemental information for a reconciliation of adjusted net cash provided by operations to net cash provided by operations of $369.2 million on a GAAP basis.

Days in claims payable were 51 as of June 30, 2007, compared with 49 as of March 31, 2007, and 54 as of June 30, 2006. The quarter to quarter increase resulted principally from the 2007 launch of the Company's Medicare private fee-for-service products.

As of June 30, 2007, the Company had cash and cash equivalents of $1.47 billion as well as investments classified as current assets of $166.3 million, for a total of $1.64 billion in cash and short-term investments.

90.     Commenting on these results, Defendant Farha stated:

Our operating results demonstrate our commitment to providing quality service to our members, providers and government partners… We will continue our focus on delivering high quality healthcare tailored to the communities we serve.

91.     On August 3, 2007, WellCare filed with the SEC its quarterly report on Form 10-

Q for the second quarter of 2007, signed by Defendant Behrens, in which the Company

reiterating the financial results set forth in the August 2, 2007 press release.  The second quarter

2007 Form 10-Q contained certifications by Defendants Farha and Behrens, pursuant to Section

302 of the Sarbanes-Oxley Act of 2002, that were substantially identical to their certifications of

55

the Form 10-K.  Defendants Farha and Behrens also certified the Form 10-Q pursuant to Section

906 of the Sarbanes Oxley Act of 2002 that "The information contained in the Form 10-Q fairly

presents, in all material respects, the financial condition and results of operations of the

Company."

92.    Under the heading "Evaluation of Disclosure Controls and Procedures," the

second quarter 2007 Form 10-Q represented that Defendants had established effective disclosure

controls and procedures, stating:

> Our management carried out an evaluation required by Rule 13a-15 under the
> Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the
> supervision and with the participation of our Chairman, President and Chief
> Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the
> effectiveness of our disclosure controls and procedures as defined in Rule 13a-15
> under the Exchange Act ("Disclosure Controls").  Based on the evaluation, our
> CEO and CFO concluded that as of June 30, 2007, our Disclosure Controls are
> effective in timely alerting them to material information required to be included in
> our reports filed with the SEC.

93.    The Individual Defendants' statements in paragraphs 57-92 were each materially

false and misleading because the Individual Defendants: (i) materially overstated the Company's

revenue and earnings by improperly accounting for its operations related to Medicare and

Medicaid programs; (ii) as a result, the Company's financial statements were in violation of

GAAP; (iii) failed to establish effective internal controls and procedures; and (iv) misrepresented

that the Company's Trust Program was effective in preventing and detecting violations of

applicable state and federal Medicare and Medicaid laws.

94.    The Individual Defendants knew or were reckless in failing to ascertain that the

Company's financial results were overstated and that they were causing the Company to conduct

its operations improperly and in violation of applicable state and federal Medicare and Medicaid laws, in violation of their fiduciary duties to the Company.

## THE INDIVIDUAL DEFENDANTS' INSIDER STOCK SALES

95.     During the Relevant Period, the Individual Defendants, in violation of their fiduciary duties, sold hundreds of thousands of their personally held shares of WellCare common stock while in possession of material adverse non-public information regarding, among other things: (i) the *qui tam* lawsuit by a former financial department employee of Harmony Behavioral Health (a WellCare subsidiary) and other whistleblowers alleging violations of state and federal laws; (ii) the Company's improper practices involving the Company's Medicare and Medicaid businesses in Florida, New York, Connecticut, and other states; (iii) artificial inflation of the amount the Company spent on mental health care in order to retain money that it should have refunded to Florida's Medicaid program; and (iv) WellCare's violations of GAAP.

96.     The price of Wellcare stock dramatically increased during the time period in which the Individual Defendants sold their stock.  From February 13, 2006 (the date the form 10-K for the year ended December 31, 2005 was filed) through October 23, 2007, the Company's stock price increased from $39.25 per share to $122.27 per share as a result of the Individual Defendants' misconduct and breaches of fiduciary duties.

97.     The Individual Defendants' Relevant Period stock sales were unusual and suspicious in timing and amount, as demonstrated in the tables below:

**BEHRENS' INSIDER STOCK SALES**

| Ticker | Date | | Shares | Sales Price | | Gross Proceeds |
| | Start | End | | Low | High | |
|---|---|---|---|---|---|---|
| WCG | 10/10/07 | 10/10/07 | 5,129 | $112.31 | $113.00 | $577,012.50 |
| WCG | 09/20/07 | 09/20/07 | 5,129 | $104.65 | $105.44 | $538,822 |
| WCG | 09/11/07 | 09/11/07 | 5,129 | $100.84 | $101.88 | $520,099 |
| WCG | 07/12/07 | 07/19/07 | 10,258 | $93.20 | $104.20 | $1,009,152 |
| WCG | 06/25/07 | 06/25/07 | 5,129 | $91.00 | $91.75 | $469,137 |
| WCG | 06/12/07 | 06/12/07 | 4,426 | $90.36 | $90.70 | $400,408 |
| WCG | 05/24/07 | 05/24/07 | 5,129 | $91.00 | $92.00 | $470,052 |
| WCG | 05/10/07 | 05/10/07 | 5,129 | $89.50 | $90.51 | $461,105 |
| WCG | 04/19/07 | 04/19/07 | 95 | $90.33 | $90.37 | $8,582 |
| WCG | 04/05/07 | 04/05/07 | 5,129 | $90.00 | $90.36 | $462,700 |
| WCG | 03/06/07 | 03/06/07 | 606 | $83.71 | $83.76 | $50,746 |
| WCG | 02/07/07 | 02/07/07 | 5,129 | $77.50 | $78.46 | $399,029 |
| WCG | 01/25/07 | 01/25/07 | 5,129 | $75.01 | $76.00 | $386,722 |
| WCG | 01/09/07 | 01/09/07 | 5,129 | $70.25 | $70.85 | $361,542 |
| WCG | 12/21/06 | 12/21/06 | 5,129 | $70.00 | $71.48 | $363,692 |
| WCG | 12/06/06 | 12/06/06 | 5,129 | $66.90 | $67.85 | $346,526 |
| WCG | 11/28/06 | 11/28/06 | 6,842 | $63.06 | $64.22 | $434,858 |
| WCG | 11/16/06 | 11/16/06 | 3,416 | $63.25 | $64.65 | $217,826 |
| WCG | 10/24/06 | 10/24/06 | 3,417 | $58.78 | $59.34 | $201,998 |
| WCG | 09/13/06 | 09/13/06 | 3,416 | $59.00 | $59.25 | $201,658 |
| WCG | 08/11/06 | 08/11/06 | 3,417 | $51.50 | $51.81 | $176,718 |
| WCG | 07/12/06 | 07/12/06 | 3,416 | $52.00 | $52.79 | $179,045 |
| WCG | 06/29/06 | 06/29/06 | 3,417 | $44.95 | $47.00 | $157,219 |
| WCG | 04/06/06 | 04/06/06 | 7,350 | $37.88 | $37.88 | $278,408 |
| WCG | 03/13/06 | 03/13/06 | 49,000 | $37.88 | $37.88 | $1,856,056 |

| Total | | | 160,624 | | | $10,529,113 |

58

| BEREDAYS' INSIDER STOCK SALES | | | | | | |
|---|---|---|---|---|---|---|
| Ticker | Transaction Date | | Shares | Sales Price | | Gross Proceeds |
| | Start | End | | Low | High | |
| WCG | 10/10/07 | 10/10/07 | 5,637 | $112.66 | $113.00 | $635,943 |
| WCG | 09/20/07 | 09/20/07 | 3,567 | $104.65 | $105.20 | $374,063 |
| WCG | 09/11/07 | 09/11/07 | 8,040 | $100.84 | $101.88 | $815,285 |
| WCG | 08/24/07 | 08/24/07 | 8,040 | $99.65 | $100.08 | $802,769 |
| WCG | 07/12/07 | 07/19/07 | 16,080 | $93.20 | $104.20 | $1,581,901 |
| WCG | 06/25/07 | 06/25/07 | 5,129 | $91.00 | $91.75 | $469,137 |
| WCG | 06/12/07 | 06/12/07 | 5,129 | $90.19 | $90.70 | $463,883 |
| WCG | 05/24/07 | 05/24/07 | 5,129 | $91.00 | $92.00 | $470,052 |
| WCG | 05/10/07 | 05/10/07 | 5,129 | $89.50 | $90.51 | $461,105 |
| WCG | 04/19/07 | 04/19/07 | 95 | $90.33 | $90.37 | $8,582 |
| WCG | 03/20/07 | 03/20/07 | 5,129 | $89.20 | $89.78 | $459,296 |
| WCG | 03/06/07 | 03/06/07 | 5,129 | $83.71 | $84.10 | $430,260 |
| WCG | 02/21/07 | 02/21/07 | 5,129 | $81.00 | $81.34 | $415,895 |
| WCG | 02/07/07 | 02/07/07 | 5,129 | $77.50 | $78.46 | $399,029 |
| WCG | 01/25/07 | 01/25/07 | 5,129 | $75.01 | $76.00 | $386,722 |
| WCG | 01/09/07 | 01/09/07 | 5,129 | $70.25 | $70.85 | $361,542 |
| WCG | 12/21/06 | 12/21/06 | 11,379 | $70.00 | $71.48 | $806,872 |
| WCG | 12/06/06 | 12/06/06 | 11,379 | $66.90 | $67.85 | $768,789 |
| WCG | 11/28/06 | 11/28/06 | 19,731 | $63.06 | $64.22 | $1,254,048 |
| WCG | 11/16/06 | 11/16/06 | 3,027 | $63.25 | $64.65 | $193,021 |
| WCG | 10/24/06 | 10/24/06 | 3,026 | $58.78 | $59.34 | $178,884 |
| WCG | 09/13/06 | 09/13/06 | 3,026 | $59.00 | $59.25 | $178,635 |
| WCG | 08/11/06 | 08/11/06 | 3,027 | $51.50 | $51.81 | $156,548 |
| WCG | 07/12/06 | 07/12/06 | 2,354 | $52.23 | $52.79 | $123,583 |
| WCG | 06/29/06 | 06/29/06 | 3,026 | $44.95 | $47.00 | $139,229 |
| WCG | 04/06/06 | 04/06/06 | 5,250 | $37.88 | $37.88 | $198,863 |
| WCG | 03/13/06 | 03/13/06 | 35,000 | $37.88 | $37.88 | $1,325,755 |
| | | | | | | |
| Total | | | 192,974 | | | $13,859,690 |

| FARHA'S INSIDER STOCK SALES | | | | | | |
|---|---|---|---|---|---|---|
| Ticker | Date | | Shares | Sales Price | | Gross Proceeds |
| | Start | End | | Low | High | |
| WCG | 10/10/07 | 10/10/07 | 16,808 | $112.31 | $113.00 | $1,895,039 |
| WCG | 09/20/07 | 09/20/07 | 16,798 | $104.65 | $105.44 | $1,764,696 |
| WCG | 09/11/07 | 09/11/07 | 16,798 | $100.84 | $101.88 | $1,703,376 |
| WCG | 08/24/07 | 08/24/07 | 16,798 | $99.65 | $100.08 | $1,677,227 |
| WCG | 8/15/2007 | 8/15/2007 | 16,798 | $93.30 | $97.50 | $1,603,000 |
| WCG | 07/19/07 | 07/19/07 | 16,798 | $102.10 | $104.20 | $1,730,430 |
| WCG | 7/12/2007 | 7/12/2007 | 16,798 | $93.20 | $94.25 | $1,574,000 |
| WCG | 06/25/07 | 06/25/07 | 16,798 | $91.00 | $91.75 | $1,536,472 |
| WCG | 6/12/2007 | 6/12/2007 | 14,504 | $90.36 | $90.70 | $1,313,000 |
| WCG | 06/12/07 | 06/12/07 | 2,294 | $90.19 | $90.35 | $207,131 |
| WCG | 05/24/07 | 05/24/07 | 16,798 | $91.00 | $92.00 | $1,539,468 |
| WCG | 05/10/07 | 05/10/07 | 16,798 | $89.50 | $90.51 | $1,510,167 |
| WCG | 4/19/2007 | 4/19/2007 | 16,488 | $90.40 | $91.03 | $1,496,000 |
| WCG | 04/19/07 | 04/19/07 | 310 | $90.33 | $90.37 | $28,006 |
| WCG | 04/05/07 | 04/05/07 | 16,798 | $90.00 | $90.36 | $1,515,391 |
| WCG | 3/20/2007 | 3/20/2007 | 16,798 | $89.20 | $89.78 | $1,503,000 |
| WCG | 3/6/2007 | 3/6/2007 | 14,810 | $83.77 | $84.10 | $1,243,000 |
| WCG | 03/06/07 | 03/06/07 | 1,988 | $83.71 | $83.76 | $166,473 |
| WCG | 2/21/2007 | 2/21/2007 | 16,798 | $81.00 | $81.34 | $1,363,000 |
| WCG | 02/07/07 | 02/07/07 | 16,798 | $77.50 | $78.46 | $1,306,860 |
| WCG | 01/25/07 | 01/25/07 | 16,798 | $75.01 | $76.00 | $1,266,554 |
| WCG | 01/09/07 | 01/09/07 | 16,798 | $70.25 | $70.85 | $1,184,088 |
| WCG | 12/21/06 | 12/21/06 | 16,798 | $70.00 | $71.48 | $1,191,128 |
| WCG | 12/06/06 | 12/06/06 | 16,798 | $66.90 | $67.85 | $1,134,908 |
| WCG | 11/28/06 | 11/28/06 | 16,798 | $63.06 | $64.22 | $1,067,634 |
| WCG | 11/16/06 | 11/16/06 | 16,798 | $63.25 | $64.65 | $1,071,147 |
| WCG | 10/24/06 | 10/24/06 | 16,798 | $58.78 | $59.34 | $993,024 |
| WCG | 09/13/06 | 09/13/06 | 16,798 | $59.00 | $59.25 | $991,644 |
| WCG | 08/11/06 | 08/11/06 | 16,798 | $51.50 | $51.81 | $868,746 |
| WCG | 07/12/06 | 07/12/06 | 16,798 | $52.00 | $52.79 | $880,442 |
| WCG | 06/29/06 | 06/29/06 | 16,798 | $44.95 | $47.00 | $772,889 |
| WCG | 04/06/06 | 04/06/06 | 28,950 | $37.88 | $37.88 | $1,096,588 |
| WCG | 03/13/06 | 03/13/06 | 193,000 | $37.88 | $37.88 | $7,310,589 |
| | | | | | | |
| Total | | | 1,089,828 | | | $46,505,115 |

**HERZLINGER'S INSIDER STOCK SALES**

| Ticker | Date | | Shares | Sales Price | | Gross Proceeds | |
|---|---|---|---|---|---|---|---|
| | Start | End | | Low | High | | |
| WCG | 08/28/07 | 08/31/07 | 24,000 | $95.50 | $98.63 | $2,323,230 | |

**HICKEYS' INSIDER STOCK SALES**

| Ticker | Date | | Shares | Sales Price | | Gross Proceeds | |
|---|---|---|---|---|---|---|---|
| | Start | End | | Low | High | | |
| WCG | 8/14/2007 | 03/12/07 | 4,000 | $98.17 | $98.53 | $393,000 | |
| WCG | 3/12/2007 | 3/12/2007 | 6,584 | $86.06 | $86.24 | $567,133 | |
| WCG | 04/06/06 | 04/06/06 | 750 | $37.88 | $37.88 | $28,409 | |
| WCG | 03/13/06 | 03/13/06 | 5,000 | $37.88 | $37.88 | $189,394 | |
| Total | | | 16,334 | | | $1,177,936 | |

**HOURANI'S INSIDER STOCK SALES**

| Ticker | Date | | Shares | Sales Price | | Gross Proceeds | |
|---|---|---|---|---|---|---|---|
| | Start | End | | Low | High | | |
| WCG | 10/08/07 | 10/08/07 | 3,000 | $108.89 | $109.75 | $328,143 | |
| WCG | 09/07/07 | 09/07/07 | 3,000 | $98.66 | $99.61 | $297,116 | |
| WCG | 08/08/07 | 08/08/07 | 3,000 | $98.34 | $98.34 | $295,026 | |
| WCG | 3/12/2007 | 3/12/2007 | 4,200 | $84.18 | $85.20 | $356,000 | |
| WCG | 03/12/07 | 03/12/07 | 800 | $85.26 | $85.59 | $68,370 | |
| WCG | 02/12/07 | 02/12/07 | 5,000 | $75.92 | $77.34 | $383,349 | |
| WCG | 01/12/07 | 01/12/07 | 5,000 | $73.70 | $74.70 | $370,762 | |
| WCG | 12/12/06 | 12/12/06 | 5,000 | $68.17 | $69.19 | $342,471 | |
| WCG | 11/30/06 | 11/30/06 | 5,000 | $64.74 | $64.91 | $323,926 | |
| WCG | 04/06/06 | 04/06/06 | 750 | $37.88 | $37.88 | $28,409 | |
| WCG | 03/13/06 | 03/13/06 | 5,000 | $37.88 | $37.88 | $189,394 | |
| $0 | $39,153 | $39,153 | $39,750 | $834 | $840 | $2,982,965 | |

**KING SHAW'S INSIDER STOCK SALES**

| Ticker | Date | | Shares | Transaction Price | | Gross Proceeds |
|--------|------|-----|--------|-----|------|--------|
| | Start | End | | Low | High | |
| WCG | 08/03/07 | 08/03/07 | 5,000 | $105.00 | $105.33 | $525,446 |
| WCG | 02/16/07 | 02/16/07 | 7,625 | $78.56 | $78.86 | $599,893 |
| WCG | 08/24/06 | 08/24/06 | 13,131 | $55.00 | $55.08 | $722,291 |
| WCG | 04/06/06 | 04/06/06 | 2,250 | $37.88 | $37.88 | $85,227 |
| WCG | 03/13/06 | 03/13/06 | 15,000 | $37.88 | $37.88 | $568,181 |
| Totals | | | 43,006 | | | $2,501,038 |

**MICHALIK'S INSIDER STOCK SALES**

| Ticker | Date | | Shares | Sales Price | | Gross Proceeds | |
|--------|------|-----|--------|-----|------|--------|--|
| | Start | End | | Low | High | | |
| WCG | 09/25/07 | 09/25/07 | 2,000 | $109.36 | $109.48 | $218,849 | |
| WCG | 08/31/07 | 08/31/07 | 2,000 | $98.65 | $98.69 | $197,329 | |
| WCG | 07/16/07 | 07/16/07 | 2,000 | $96.22 | $96.30 | $192,482 | |
| WCG | 06/28/07 | 06/28/07 | 2,000 | $91.68 | $91.73 | $183,425 | |
| WCG | 05/23/07 | 05/23/07 | 2,000 | $90.12 | $90.20 | $180,307 | |
| WCG | 04/16/07 | 04/16/07 | 2,000 | $89.93 | $89.95 | $179,873 | |
| WCG | 03/19/07 | 03/19/07 | 2,000 | $89.05 | $89.13 | $178,176 | |
| WCG | 3/8/2007 | 3/8/2007 | 7,000 | $85.13 | $85.42 | $597,000 | |
| WCG | 02/27/07 | 02/27/07 | 4,000 | $81.13 | $81.32 | $324,928 | |
| Totals | | | 25,000 | | | $2,252,369 | |

| MOSZKOWSKIS' INSIDER STOCK SALES | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Ticker | Date | | Shares | Sales Price | | Gross Proceeds | |
| | Start | End | | Low | High | | |
| WCG | 10/16/2007 | 10/16/2007 | 10,000 | $112.44 | $113.27 | $1,129,000 | |
| WCG | 09/17/07 | 09/17/07 | 10,000 | $99.75 | $100.38 | $1,000,164 | |
| WCG | 08/16/07 | 08/16/07 | 10,000 | $91.33 | $92.91 | $919,929 | |
| WCG | 07/16/07 | 07/16/07 | 10,000 | $95.70 | $96.43 | $961,286 | |
| WCG | 06/18/07 | 06/18/07 | 10,000 | $88.62 | $90.18 | $895,816 | |
| WCG | 5/16/2007 | 5/16/2007 | 6,000 | $90.14 | $90.83 | $543,000 | |
| WCG | 5/16/2007 | 5/16/2007 | 4,000 | $89.39 | $90.13 | $359,000 | |
| WCG | 04/16/07 | 04/16/07 | 10,000 | $88.95 | $89.52 | $892,466 | |
| WCG | 3/16/2007 | 3/16/2007 | 2,000 | $85.04 | $85.41 | $170,000 | |
| WCG | 03/16/07 | 03/16/07 | 8,000 | $85.02 | $85.76 | $683,939 | |
| WCG | 02/16/07 | 02/16/07 | 10,000 | $77.92 | $79.99 | $787,909 | |
| Total | | | 90,000 | | | $8,342,508 | |

98.     At the time the stock sales were made, the Individual Defendants knew and/or recklessly disregarded that the Company's financial statements were false, and that as a result the Company's stock price was artificially inflated.

99.     Additionally, TowerBrook Investors, an entity for which Defendant Moszkowski is directly interest, and its affiliates, liquidated its approximately 14% interest in WellCare, selling over 5.1 million shares, which netted TowerBrooks Investors and its affiliates approximately $870 million at a time the Individual Defendants knew the Company's financial statements were materially false and misleading because they were overstated as a result of the Individual Defendants.

### **THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

100.     In an effort to enrich themselves at the expense of investors, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their schemes.  The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.  Specifically, the

63

Individual Defendants breached their fiduciary duties by, among other things; (a) failing to implement any reporting or information systems or controls; or (b) having  implemented  such  a system or controls consciously failed to monitor or oversee its operations thus disabling the Individual Defendants from being informed of risks or problems requiring their attention; (c) causing or allowing the other Defendants to misrepresent the Company's financial results and producing and disseminating to WellCare shareholders and the market false financial statements that included these improper financials.  Contrary to the their representations the Company was not operating according to plan, as the Defendants had artificially inflated the Company's results by manipulating WellCare's accounting for revenue and earnings and materially overstated its profitability by failing to properly account for the Company's health care expense and results of operations.

101.    Additionally, the Individual Defendants breached their fiduciary duties by  using material  non-public  information  (*i.e.*,  the  true  financials  and  violations  of  Medicaid  and Medicare laws) to profit through the sale of their personally held shares of WellCare stock at artificially high prices.

102.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

103.    Additionally, in breach of both their fiduciary duties of good faith care and loyalty and, with respect to the Audit Committee Defendants, their responsibilities pursuant to the Audit Committee Charter, the Individual Defendants willfully ignored the problems with WellCare's

accounting and internal control practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

104.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained and will continue to sustain damages, including, but not limited to, the costs and expenses in connection with the various government investigations of the Company, its own internal investigation, potential loss of business, and being subjected to potential civil liabilities and SEC fines for violations of the anti-fraud provisions of the federal securities laws *qui tam*.

105.    The Individual Defendants have sold thousands of shares of WellCare stock at a time when the Company's stock was artificially inflated due to the Individual Defendants' breaches of fiduciary duties.   Consequently, the Individual Defendants have been unjustly enriched by garnering millions of dollars in illicit profits.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

106.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

107.    Plaintiff is an owner of WellCare common stock and was an owner of WellCare common stock at all times relevant hereto.

108.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

109.    As a result of the facts set forth herein, Plaintiff has not made any demand on the WellCare Board to institute this action against the Individual Defendants.   Such demand would

be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

110.    In order to bring this suit, Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski would be forced to sue themselves and persons with whom they have extensive business and personal relationships, which they will not do, thereby making demand on the Board a futile and excusing the same.

111.    At the time this action was commenced, the Board consisted of eight directors, which include Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski.   The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

a.      Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski, because they personally profited from the illegal insider sales WellCare stock complained of herein, and thus, they are directly interested in this action. Therefore, they are substantially likely to be held liable for breaching their fiduciary duties of good faith and loyalty, as alleged herein;

b.      Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski, because, at all times relevant to this action, they knew or should have known of the ongoing violations of law and improper Medicare and Medicaid practices that were occurring at WellCare and, in either event, they took no steps in a good faith effort to prevent or remedy this situation, and this systematic failure to act proximately resulted in the harm to WellCare complained of in this action. Therefore, they are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein;

c.      Defendants Herzlinger, Hourani, and Michalik because as members of the Audit Committee, they directly participated in and approved the filing of false financial statements and other false SEC filings and directly participated in and approved the Company's violations of GAAP, as alleged herein, and therefore are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.   Moreover, Defendants Herzlinger, Hourani, and Michalik are principal beneficiaries of the

66

dissemination of the false financial statements alleged herein, and therefore, they will not vigorously prosecute this action;

d.     Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski, because as directors of the Company, they directly participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore are substantially likely to be held liable for breaching their fiduciary duties. Moreover, Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski are principal beneficiaries of the dissemination of the false financial statements alleged herein, and therefore, they will not vigorously prosecute this action;

e.     Defendant Farha, because his principal professional occupation is his position as Chief Executive Officer and President of the Company, pursuant to which he receives more than $800,000 per year in salary and cash bonuses, plus thousands of shares of WellCare stock and stock options.  Indeed, WellCare's proxy statement, filed with the SEC on Form DEF 14A on April 27, 2007, acknowledges that "[a] director, who is, or has been within the last three years, ***an employee of the company or any subsidiary … or has been within the last three years, an executive officer of the company, is not independent…***"  Accordingly, Farha is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the other Individual Defendants particularly Defendants Hickey, Hourani, and Moszkowski who are currently on the Compensation Committee;

f.     Defendant Farha is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against Defendant Hickey, with whom he has had extensive business and personal relationships, including serving together in senior executive positions at Oxford Health Plans, Inc.;

g.     Defendant Hickey is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against Defendant Farha, with whom he has had extensive business and personal relationships, including serving together in senior executive positions at Oxford Health Plans, Inc.;

h.     Defendant Mihalik is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against Defendant Moszkowski, with whom he has had extensive business and personal relationships, including serving together in senior executive positions at Soros Equity Partners LLC;

67

i.    Defendant Moszkowski is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against Defendant Mihalik, with whom he has had extensive business and personal relationships, including serving together in senior executive positions at Soros Equity Partners LLC;

j.    Defendant King-Shaw, according to WellCare's proxy statement filed with the SEC on Form DEF 14A on April 27, 2007, is not independent because he provided certain consulting services for the Company during 2004 for which he was paid compensation valued in excess of $100,000. Accordingly, King-Shaw is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the other Individual Defendants;

k.    Defendant Hourani is a cousin of Defendant Farha and has a history of employment and/or affiliations with entities in which Defendant Farha is an officer, director or owner, including Physician Corporation of America. Accordingly, Hourani is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against Farha; and

l.    Defendants Herlinger, Hickey, Hourani, King-Shaw, and Michalik have received substantial annual compensation from WellCare for serving as non-executive directors on the WellCare Board, including annual retainers, stock options, consulting fees, and committee stipends, as detailed in the Company's annual proxy statements, and each has a strong financial interest in preserving his/her Board positions in order to ensure their continued receipt of such remuneration. Accordingly, Defendants Herlinger, Hickey, Hourani, King-Shaw, and Michalik are each incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the other Individual Defendants.

112.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment, and Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski each face a substantial likelihood of liability for breaching their fiduciary duties because, through their wrongful conduct, they have harmed WellCare by causing the Company to: (i) incur substantial sums in responding to the ongoing investigations by the FBI, Health and Human Services, the

Florida A.G., the Attorneys General of New York and Connecticut, Moody's debt rating agency, and the SEC; (ii) incur costs by the Special Committee of the Board in conducting its internal investigation of the Individual Defendants' misconduct, including costs for retaining legal counsel and expert consultants to assist in the investigation; (iii) incur substantial sums in defending federal securities fraud class action lawsuits that are currently pending in this District and subjecting the Company to potential civil liability; (iv) incur substantial sums in defending *Qui Tam* actions and subjecting the Company to potential civil liability; and (v) incur costs associated with obtaining waivers of debt covenants from the Company's lenders.   Thus, Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski's misconduct has subjected the company to expenses, fines, penalties, judgments in connections with the securities fraud class actions and *qui tam* actions, and therefore, a pre-suit demand on the Board would be futile.

113.    The acts complained of herein constitute violations of fiduciary duties owed by Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski and these acts cannot be ratified by shareholders.

114.    Any suit by director Defendants Farha, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski to remedy the wrongful acts complained of herein would likely expose their own misconduct and further expose these Defendants to civil liability for violations of the federal securities laws and the False Claims Act, and it would impair their defense of the securities fraud class actions and other litigation currently pending against these Defendants, and thus, they are hopelessly conflicted in making any decision whether to sue themselves.

115.    WellCare has been and will continue to be exposed to significant losses due to the wrongful acts complained of herein, however, the Individual Defendants have failed to institute any litigation against the Board or senior executives of the Company, who were responsible for this misconduct in order to obtain a recovery for WellCare of the damages it has sustained.

116.    As disclosed in the Company's SEC filings, WellCare is in the business of represented in WellCare's proxy statements, the Company's shareholder-approved stock option plans are "designed to promote the identity of long-term interests between the Company's employees and its shareholders and assist in the retention of executives" and "align compensation with business objectives and individual performance and to enable the Company to attract, retain and reward executive officers who are expected to contribute to the long-term success of the Company."  However, by granting options with backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of WellCare's performance.  In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

117.    The Individual Defendants could have achieved the stated purpose of "attract[ing] and retain[ing] highly qualified executives" by granting those employees additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants.  Instead, the Individual Defendants were able to placate WellCare's employees by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

118.    The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected WellCare to potentially massive liability.   WellCare completed its internal investigation and admitted to backdating stock option grants.   The Company also announced that it will restate its previously issued financial statements due to errors in its accounting for compensation expenses.   The SEC has also initiated an informal investigation into WellCare's historical option grants.   WellCare will likely suffer tax liabilities for the additional compensation they will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

### COUNT I
**Against All Individual Defendants for Violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder**

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120.    Between 2006 and the present, the Individual Defendants disseminated or approved false and misleading statements, as alleged herein, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

121.    Individual Defendants violated § 10(b) of the Securities Exchange Act of 1934 Act and Rule 10b-5 promulgated thereunder, in that they

(a)    Employed devices, schemes and artifices to defraud; and/or

(b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or

(c)      Engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Company.

122.   The Individual Defendants and in concert, directly or indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of WellCare as specified herein.

123.   Defendants Behrens, Farha, Graham, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendants Behrens, Farha, Graham, Herzlinger, Hickey, Hourani, King-Shaw, Michalik, and Moszkowski were among the senior management and directors of the Company, and therefore, were directly responsible for the fraud alleged herein.

124.   Each of the Individual Defendants' primary liability arises from the fact that these Defendants were high-level executives and/or directors at the Company during the Relevant Period and members of the Company's management team and each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director the Company was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports each of these Defendants enjoyed significant personal

contact and familiarity with the other Defendants and was advised of and has access to their data and information about the Company's finances, operations, and sales at all relevant times.

125.    In addition to their false and misleading statements and omissions, the Individual Defendants also violated the "abstain or disclose" rule by selling WellCare stock while in possession of material, adverse, non-public information concerning the Company and, in particular, the violations of applicable state and federal Medicare and Medicaid laws, as alleged herein, which caused the Company to issue public statements that falsely portrayed the Company's financial condition.

126.    The Company relied on the Individual Defendants' material misstatements and omissions granting the Individual Defendants' compensation, including salaries, bonuses, stock options, shares of common stock registered and/or issued by WellCare during the relevant period under the WellCare Health Plans, Inc. 2004 Equity Incentive Plan, and the sale of shares of common stock to or through underwriters, dealers and agents, or directly to purchasers pursuant to certain shelf registration statements in effect during the relevant period.

127.    As a direct and proximate result of the Individual Defendants' misconduct, WellCare suffered damages including, but not limited to, the costs and expenses in connection with the various government investigations of the Company, its own internal investigation, loss of business and/or government contracts, and being subjected to potential civil liabilities and fines for violations of the anti-fraud provisions of the federal securities laws.

## COUNT II
### Against All Individual Defendants for
### Violations of § 20(a) of the Securities Exchange Act of 1934

128.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.    The Individual Defendants, by virtue of their positions with WellCare and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of WellCare within the meaning of 20(a) of the Securities Exchange Act of 1934.  They had the power and influence and exercised the same to cause WellCare to engage in the illegal conduct and practices complained of herein.

## COUNT III
### Against All Individual Defendants for
### Breach of Fiduciary Duties

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    As alleged herein, the Individual Defendants owed and owe WellCare fiduciary duties.  By reason of their fiduciary relationships, the Individual Defendants owed and owe WellCare the fiduciary obligations of good faith and are required to use their utmost ability to ensure that the Company operates in a fair, just, honest and equitable manner and complies with all laws, rules and regulations and were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the company.

132.    Each of the Individual Defendants knew, or should have known, or recklessly disregarded that the Individual Defendants violated and breached their fiduciary duties.

133.    Each of the Individual Defendants had actual or constructive knowledge that he or she had caused the Company to overstate revenues, net income and earnings, and knew of or constructive knowledge of the Defendants' violations of state and federal Medicare and Medicaid laws and failed to correct the resulting publicly reported financial results. These actions could not have been in a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

134.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary duties, the Company has suffered significant damages.

## COUNT IV
### Against All Individual Defendants for Unjust Enrichment

135.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

136.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of WellCare.  These wrongful acts included the illegal sales of WellCare common stock and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

137.    Plaintiff, as a shareholder and representative of WellCare, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, including all proceeds derived from their illegal sales of WellCare common stock.

138.    By reason of the foregoing, Plaintiff on behalf of the Company is entitled to appropriate equitable relief as they have no adequate remedy at law.

**COUNT V**
**Against All Individual Defendants Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

139.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140.   At the time of the stock sales as set forth herein, Individual Defendants knew the non-public information described above, and sold WellCare common stock on the basis of such information.

141.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.   It was a proprietary asset belonging to the Company, which the Individual Defendants used for their own benefit when they sold WellCare common stock.

142.   At the time of their stock sales, the Individual Defendants knew, among other things, that the Company's financials were materially false.   The Individual Defendants' sales of WellCare common stock while in possession and control of this material adverse and non-public information was a breach of their fiduciary duties of good faith and loyalty to WellCare.

143.   Since the use of Company's proprietary information for their own gain constitutes a breach of the Individual Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Individual Defendants obtained thereby.

**COUNT VI**
**Against All Individual Defendants for Abuse of Control**

144.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

76

145.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence WellCare for which they are legally responsible.

146.    As a direct and proximate result of the Individual Defendants' abuse of control, WellCare has sustained significant damages.

147.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

148.    By reason of the foregoing, Plaintiff on behalf of the Company is entitled to appropriate equitable relief as they have no adequate remedy at law.

### COUNT VII
**Against All Individual Defendants for Gross Mismanagement**

149.    Plaintiff incorporates by reference and realleges each and every allegation contained above as set forth herein.

150.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of WellCare in a manner consistent with the operations of a publicly held corporation.

151.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breach of duties alleged herein, WellCare has sustained significant damages.

152.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

153.    By reason of the foregoing, Plaintiff on behalf of the Company is entitled to appropriate equitable relief as they have no adequate remedy at law.

## COUNT IIX
### Against All Individual Defendants for Waste of Corporate Assets

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155.    As a result of the improprieties alleged herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused WellCare to waste valuable corporate assets and incur costs to, among other things, conduct investigations, hire outside counsel, accounting firms and consultants.

156.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

157.    By reason of the foregoing, Plaintiff on behalf of the Company is entitled to appropriate equitable relief as they have no adequate remedy at law.

## COUNT IX
### Aiding and Abetting Breaches of Fiduciary Duties Against All Individual Defendants

158.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

159.    The Individual Defendants owe the Company the fiduciary duties of care, good faith and unflinching loyalty.  That the Individual Defendants owe the Company these fiduciary duties is well known to each Individual Defendants.

160.    As is detailed in the proceeding paragraphs, the Individual Defendants have breached their fiduciary duties to the Company.

161.    Each Individual Defendant aided and abetted every other Individual Defendants' breaches of fiduciary duty.  Each Individual Defendant actively and knowingly induced the other

Individual Defendants to breach their fiduciary duties to WellCare and colluded with the Individual Defendants in their attempts to circumvent the Individual Defendants' fiduciary duties.

162.    Each Individual Defendant colluded in or aided and abetted the other Individual Defendants' breached of fiduciary duties, and was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to Plaintiff and the Company.

163.    Each Individual Defendant participated in the breaches of fiduciary duties by the other Individual Defendants for the purpose of advancing its own interests.  Each Individual Defendant will obtain both direct and indirect benefits from colluding in or aiding and abetting the other Individual Defendants' breaches.  Each Individual Defendant benefits *inter alia*, from the other Individual Defendants breaches of fiduciary duty.

164.    WellCare has been harmed by the Individual Defendants aiding and abetting other Individual Defendants' breaches of fiduciary duty.

165.    By reason of the foregoing, Plaintiff on behalf of the Company is entitled to appropriate equitable relief as they have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Ordering the Individual Defendants to disgorge to the Company all proceeds they received from their illegal sale of WellCare stock, in addition to all other proceeds derived from WellCare.

C.      Declaring that the Individual Defendants are liable under of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder and awarding WellCare damages;

D.      Directing WellCare to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect WellCare shareholders from a repeat of the damaging events described  herein, including but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may necessary to place before shareholders for a vote the following corporate governance policies:

1.      Strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      Control and limit insider stock selling; and

3.      Test and then strengthen the internal audit and control functions.

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding or otherwise restricting the proceeds of the Individual Defendants' trading activities and their other assets so as to assure that Plaintiff, on behalf of WellCare, has an effective remedy;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Respectfully submitted,

ENGLANDER & FISCHER, P.A

By: /s/ Leonard S. Englander
Leonard S. Englander
**ENGLANDER & FISCHER, P.A**
Florida Bar No. **[FILL IN]**
721 First Avenue North
St. Petersburg, FL 33701
Tel: (727) 898-7210
Fax: (727) 898-7218
lenglander@efpalaw.com

Kenneth I. Trujillo
Ira Neil Richards
Kathryn C. Harr
**TRUJILLO RODRIGUEZ
& RICHARDS, LLC**
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
Tel: (215) 731-9004
Fax: (215) 731-9044
ktrujillo@trrlaw.com
ira@trrlaw.com
kharr@trrlaw.com

Sherrie R. Savett
Eric Lechtzin
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3071
Fax: (215) 875-4604
ssavett@bm.net
elechtzin@bm.net

Joe R. Whatley Jr.
Deborah Clark-Weintraub
**WHATLEY DRAKE & KALLAS, LLC**
1540 Broadway, 37th Floor
New York, NY 10036
Tel: (212) 447-7070
Fax: (212) 447-7077
jwhatley@wdklaw.com
dweintraub@wdklaw.com

Adam P. Plant
**WHATLEY DRAKE & KALLAS, LLC**
2001 Park Place North, Suite 1000
Birmingham, AL 35203
Tel: (205) 328-9576
Fax: (205) 328-9669
aplant@wdklaw.com

*Counsel for the City of Philadelphia, Pennsylvania, Board of Pensions and Retirement*